461 F.2d 158
 149 U.S.App.D.C. 67, 9 UCC Rep.Serv. 1243
 In re PARKWOOD, INC.
AMERICAN SECURITY AND TRUST CO., TRUSTEE IN REORGANIZATION
OF PARKWOOD, INC., Appellant
v.
EQUITABLE LIFE INSURANCE CO. In re PARKWOOD, INC.
AMERICAN SECURITY AND TRUST CO., TRUSTEE IN REORGANIZATION
OF PARKWOOD, INC., Appellant
v.
MANUFACTURERS LIFE INSURANCE CO.
In re ADAMS PROPERTIES, INC.
AMERICAN SECURITY AND TRUST CO., TRUSTEE IN REORGANIZATION
OF ADAMS PROPERTIES, INC., Appellant
v.
HARTFORD LIFE INSURANCE CO.
 Nos. 24116-24118.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 1, 1971.
Decided Nov. 10, 1971.
Rehearing En Banc Denied
March 3, 1972.
 
 Mr. John S. Hoff, Washington, D. C., with whom Mr. Alexander B. Hawes, Washington, D. C., was on the brief, for appellant.
 Mr. Benjamin W. Dulany, Washington, D. C., with whom Mr. Andrew T. Altmann, Washington, D. C., was on the brief, for appellee Equitable Life Insurance Company.
 Mr. Jo V. Morgan, Jr., Washington, D. C., for appellee Manufacturers Life Insurance Company.
 Mr. Daniel Webster Coon, Washington, D. C., with whom Mr. James P. Parker, Washington, D. C., was on the brief, for appellee Hartford Life Insurance Company.
 Before BAZELON, Chief Judge, and WILKEY, Circuit Judge, and VAN PELT,* Senior United States District Judge for the District of Nebraska.
 WILKEY, Circuit Judge.
 
 
 1
 American Security and Trust Company, as Trustee in Reorganization for Parkwood, Inc., and Adams Properties, Inc., appeals from a denial of its objections to and the allowance of the secured claims of the three appellees, first by the Referee in Bankruptcy and then by the United States District Court. For the reasons set forth herein we affirm the District Court's rulings as to appellee Manufacturers, reverse as to appellee Hartford, and remand for further proceedings as to appellee Equitable.
 
 I. Procedural and Common Factual Background
 
 2
 In May and July 1966 petitions were filed in the District Court under Chapter X of the Bankruptcy Act for reorganization of Parkwood, Inc., and Adams Properties, Inc. (wholly owned subsidiary of Parkwood). In October 1966 Equitable Life Insurance Company filed a proof of claim as a secured creditor of Parkwood in the principal amount of $226,654.10; Manufacturers Life Insurance Company did likewise in the principal amount of $562,963.62; and Hartford Life Insurance Company filed as a secured creditor of Adams Properties, Inc., in the principal amount of $78,803.31. All claims were evidenced by a note or notes and a deed of trust.
 
 
 3
 On 1 May 1968 the Trustee objected to all three claims. By order of 26 March 1969 the Referee in Bankruptcy denied the Trustee's objections and allowed all three claims.
 
 
 4
 On petition for review of this order, after hearing argument the District Court, by order of 4 February 1970, denied the Trustee's petition for review, ratified the order of the Referee, and confirmed and adopted the Referee's memorandum and his findings of fact and conclusions of law.
 
 
 5
 While there are important differences, the facts common to the three assertedly secured creditors are these. In each instance the original borrower obtained a loan from a corporation allegedly engaged in the business of lending money in the District of Columbia, executing a note or notes therefor and securing the indebtedness by a deed of trust on property located in the State of Maryland. Each original note bore interest in excess of 6%, thus running afoul of the District of Columbia Loan Shark Law,[1] if such law applies to the transaction. Thereafter, in the instance of Equitable, the original debtor sold the property to Parkwood, which took the property subject to the deed of trust but did not assume the note. In the instance of Manufacturers, the original loan was made by Manufacturers through a mortgage loan correspondent in the District of Columbia, and thereafter the original debtor sold the property to Parkwood, who took the property subject to the deeds of trust but did not assume the two notes. In the instance of Hartford, the original debtor sold the property to Adams, who likewise took the property subject to the deed of trust but did not assume the note.
 
 
 6
 The issues involve principally the standing of the Trustee to attack the validity of the deeds of trust held by the secured claimants; the applicability of Sec. 601 of the District of Columbia Loan Shark Law to loans by insurance companies; whether the real estate brokermortgage banker, the original maker of the loan held by Hartford, is exempt under Sec. 610 of that law; and, even if the above issues be decided in favor of the Trustee, whether certain facts peculiar to each individual claim would enable the secured claimant to maintain its position.
 
 
 7
 II. Standing of the Trustee to Attack the Validity of the Deeds of Trust
 
 
 8
 Of all the complex legal issues we have to determine in this case, perhaps this is the simplest to resolve. It will aid in clarity of analysis to keep in mind these facts: that the Trustee here is not acting on behalf of Parkwood and Adams, the debtor corporations, but on behalf of all creditors, particularly the unsecured creditors; that none of the notes secured by the deeds of trust was assumed by either Parkwood or Adams, and therefore the claims against the bankrupt estate rest entirely and only on the deeds of trust covering the particular pieces of realty involved. Two of the principal grounds relied upon by the Referee, and approved by the District Court, were that the Trustee was "estopped" from attacking the validity of the deeds of trust and therefore could not set them aside by asserting rights under Secs. 70(c) and (e) of the Bankruptcy Act, and that somehow it was inequitable or would be a windfall to Parkwood and Adams to have these deeds of trust set aside. We think these two bases of decision by the Referee and the District Court were unsound.
 
 
 9
 In the first instance, what is equitable in a bankruptcy proceeding-and bankruptcy is part of the equity jurisdiction of the District Court-has been rather specifically spelled out in the Bankruptcy Act itself. In the second place, those provisions equally specifically give the Trustee here a right to set aside invalid deeds of trust.
 
 
 10
 Under Sec. 70(c) of the Bankruptcy Act[2] the trustee possesses the rights of any hypothetical lien creditor of the debtor. The trustee's rights do not depend on the existence of any such creditor, but it has the status of "the ideal creditor, irreproachable and without notice, armed cap-a-pie with every right and power which is conferred by the law of the state upon its most favorite creditor who has acquired a lien by legal or equitable proceedings."[3]
 
 
 11
 It follows that in the exercise of such rights the trustee cannot be affected by any so-called estoppel which may be attributable to the debtor. The whole purpose of Sec. 70(c) was to give the trustee defenses which the trustee might otherwise not have if he were confined to the position of the bankrupt, who may very frequently have engaged in various acts which would estop him to deny the validity of his security obligations. The bankrupt may have engaged in chicanery or favoritism of certain creditors or other acts that "are in derogation of the Bankruptcy Act's paramount purpose: equality of distribution among all creditors. . . . The trustee would be sorely handicapped if he were not accorded some superior status, attaching as of the date of bankruptcy, that would enable him to challenge the validity of such transactions. This, then, is the purpose of the second sentence of Sec. 70(c). It has been justly and characteristically termed 'the strong-arm clause."'[4]
 
 
 12
 As of the date the petition for reorganization was filed the Trustee here gained the rights and powers of a lien creditor who had perfected his lien on the property of the debtor, irrespective of whether such a creditor actually exists, so says Sec. 70(c). Among other powers of a lien creditor is the right to set aside an invalid deed of trust on the property.[5]
 
 
 13
 In addition to the trustee's rights under Sec. 70(c), which apply versus all three mortgagees here, under Sec. 70(e)[6] of the Bankruptcy Act the trustee can assert the rights of any existing creditor who could move to set aside the deed of trust held by Equitable. In contrast to Sec. 70 (c), Sec. 70(e) requires the existence of a real creditor having that power. Potomac Cooperators, Inc., holds a second deed of trust on the same property on which Equitable holds a first deed of trust, and has filed proof of claim in the bankruptcy proceeding as a secured creditor. The Trustee himself, for the same reason that Potomac Cooperators could move to set aside the allegedly invalid deed of trust held by Equitable, moved to void the deed of trust under Sec. 70(e). Furthermore, the directive in Sec. 47(a) (8) of the Bankruptcy Act[7] to "examine all proofs of claim and object to the allowance of such claims as may be improper" requires the trustee to object to all invalid security instruments. In so doing, the trustee is acting for the benefit of all creditors and not, as the Referee and the court seemed to think, to create a "windfall" for the reorganized corporations whose affairs are being administered.[8]
 
 
 14
 We conclude that the Trustee had standing to attack the validity of the deeds of trust held by the claimant insurance companies under Secs. 70(c) and 70(e) of the Bankruptcy Act, and that the District Court erred in holding to the contrary.
 
 
 15
 III. The Applicability of the District of Columbia Loan Shark Act to Loans Made by Insurance Companies
 
 
 16
 Section 26-601 of the District of Columbia Code provides:
 
 
 17
 It shall be unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than six percentum per annum is charged on any security of any kind . . . without procuring license. . . .
 
 
 18
 Section 26-610 of the Code exempts certain specified types of businesses from the operation of Sec. 26-601. At the time the loans herein were made, life insurance companies were not among the businesses so exempted. In construing Sec. 26-601 this court has held that
 
 
 19
 It applies to all who would engage, in the District of Columbia, in the business of lending money upon which a rate of interest greater than six per centum per annum is charged, except those exempted by section 26-610.[9]
 
 
 20
 Appellees Equitable and Manufacturers nevertheless argue that Sec. 26-601 does not apply to insurance companies which "invest" their funds by making loans secured by real estate. This argument, which the District Court accepted, rests essentially upon three bases which we now examine.
 
 
 21
 First, it is maintained that life insurance companies are not engaged in the business of loaning money, but rather that the making of loans (the "investment of funds" in appellees' terms) is an integral part of the insurance business. But there is nothing in the statute which suggests that it applies only to those whose sole business is that of loaning money. In fact, Sec. 26-601 regulates the regular activity of loaning money regardless of whether those who are so engaged do so as part of another business.[10] Indeed, while not disputing that the lending of money is an integral part of the insurance business, appellant points out that if that were sufficient to remove a company from the coverage of Sec. 26-601, then the exemption section (Sec. 26-610) would be largely unnecessary.
 
 
 22
 Section 26-610 provides that nothing in Sec. 26-601 shall apply "to the legitimate business of national banks, licensed bankers, trust companies, savings banks, building and loan associations . . . or real estate brokers."[11] Each of these exempted businesses is obviously engaged in activity which integrally involves the loaning of money. Thus if insurance companies were to be held not to be in the business of loaning money simply because their loans are an integral part of another, i. e., the insurance, business, the same rationale would apply for example to banks, whose loans can be said to be an integral part of the banking business, and there would have been no need specifically to exempt banks from the operation of the statute. We thus cannot agree with the Referee in Bankruptcy and the District Court that life insurance companies which regularly loan money on security are not "engaged in the business of loaning money" simply because they do so as part of their insurance business.
 
 
 23
 The second ground advanced to sustain the District Court's ruling is that since life insurance companies are comprehensively regulated under the provisions of Title 35 of the District of Columbia Code, they cannot be subject to licensing regulation of their lending activities under Sec. 26-601.[12] In the first place, we note that many of the other businesses exempted by Sec. 26-610 are also extensively regulated under other provisions of the District of Columbia Code or otherwise, but that such regulation did not obviate the need specifically to exempt them in Sec. 26-610. Furthermore, we find nothing in Title 35 which conflicts with the purpose of regulation of lenders under Sec. 26-601. Title 35 is concerned with the regulation of insurance companies for the protection of their policyholders. The Loan Shark Law, on the other hand, regulates those in the business of loaning money, in order to protect borrowers. Such regulation of lending activities for the protection of borrowers is in no way inconsistent with the regulation of insurance activities for the protection of policyholders.
 
 
 24
 The Referee and the District Court cited D.C.Code Sec. 35-535 which authorizes life insurance companies to lend money against the security of real estate. But Sec. 35-535 is nothing more than a "legal list" of investments which life insurance companies are permitted to make and is clearly directed toward the protection of policyholders. It says nothing concerning the terms on which such loans may be made, and thus in no way precludes other regulation for the protection of borrowers where interest in excess of 6% is to be charged. To hold that regulation of the insurance business as such, under one part of the Code, automatically exempts insurance companies from other types of regulation would nullify the effect of many general regulatory statutes insofar as the operations of insurance companies are concerned. For example, the same reasoning would support the conclusion that insurance companies were not subject to the usury statute, D.C. Code Sec. 28-3301. And the provision in Sec. 35-535(14) (f) that life insurance companies may acquire real estate "for the production of income . . . [and] may improve or otherwise develop in any manner such real estate . . ." might, under the reasoning of the District Court, lead to the conclusion that life insurance companies which own property need not comply with the building and zoning regulations of the District. We conclude, as we must, that nothing in Title 35's regulation of insurance companies prevents or precludes the application of Sec. 26-601 to loans such as those involved in the case at bar.
 
 
 25
 Finally, appellees urge that the legislative history of the Loan Shark Act indicates that it was not intended to apply to large loans made by "institutional lenders" and secured by real estate. In the first place, this view ignores the principle that where the meaning of a statute is plain on its face, interpretation thereof by resort to legislative history is improper.[13] Here the Act plainly applies to all who are in the business of lending money on security at a rate of interest in excess of 6% except for those types of organizations specifically exempted from coverage by Sec. 26-610. And this court has expressly held that Sec. 26-601 applies to large loans secured by real estate.[14]
 
 
 26
 As illustrative of the general recognition that large loans secured by real estate do fall within Sec. 26-601, one need only consider the position of real estate brokers. Acting as agents for others, real estate brokers customarily participate in transactions involving large real estate loans. If such transactions did not fall within Sec. 26-601, it would never have been thought necessary to include real estate brokers in the list of those exempted under that section.
 
 
 27
 In contrast, prior to 1963 life insurance companies were not included in the list of organizations exempted by Sec. 26-610. It therefore inexorably follows that life insurance companies which prior to 1963 made loans at interest rates in excess of 6% were required to be licensed under Sec. 26-601. And if such loans were made without a license in violation of Sec. 26-601, they are, under the prior holdings of this court, together with the promissory notes and deeds of trust given therefor, illegal and void. As we held in Hartman v. Lubar,[15]
 
 
 28
 if the disputed loan was made by one who was engaging in the business of lending money in violation of the law, and if the loan was made in the course of that business, then it constituted an illegal contract. The general rule is that an illegal contract, made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no right upon the wrongdoer. * * * Every consideration of public policy suggests that a contract made in violation of the Loan Shark Law should be unenforceable.
 
 
 29
 If Congress, when it exempted life insurance companies from the coverage of the Loan Shark Act in 1963, had intended to validate previous transactions made by life insurance companies in violation of the Loan Shark Act, it could have done so by providing that the exemption granted in 1963 would have a retroactive effect. It did not do so.[16]
 
 
 30
 The history of other exemptions added to Sec. 26-610 is illuminating. In 1960 Congress added small business investment companies to the list of those exempted. The House Committee on Banking and Currency stated the necessity for such exemption in terms unmistakably refuting the position of appellee insurance companies here:
 
 
 31
 Although it [Sec. 26-601 et seq.] was obviously not intended to apply to SBIC's, it does apply to them literally and constitutes an obstacle to effective operation of SBIC's in the District of Columbia. The bill grants the same exemption for SBIC's that is now written into the law for commercial banks, savings banks, savings and loan associations, and real estate brokers.[17]
 
 
 32
 Again in 1962, in hearings on the bill predecessor to the 1963 amendment, which eventually exempted life insurance companies under Sec. 26-610, Congress was well aware that Sec. 26-601 applied to all entities not specifically exempted by Sec. 601, including life insurance companies. Testimony of the Chairman of the Legislative Committee, Mortgage Bankers Association of Metropolitan Washington, asserted that a majority of life insurance companies making mortgage loans in the District of Columbia had decided on advice of counsel that, as a result of court decisions and the omission of insurance companies from the list of those lending institutions exempted from the so-called Loan Shark Law, such insurance companies should not lend money in the District of Columbia at rates in excess of 6%.[18] The purpose of H.R. 9441 (the predecessor in the preceding Congress of H.R. 3191 enacted in the 88th Congress) was described as "to remove a barrier that now prevents the free flow of money into the District of Columbia for investment and mortgage loans on real estate."[19]
 
 
 33
 Under established principles of statutory construction it is significant that Congress acted to add small business investment companies and insurance companies to the list of exemptions under Sec. 26-610, and has never sought to amend Sec. 26-601 after this court's repeated interpretation of Sec. 26-601 as including "all who would engage, in the District of Columbia, in the business of lending money upon which a rate of interest greater than 6 per centum per annum is charged, except those exempted by Sec. 26-610."[20] If Congress had interpreted Sec. 26-601 as the District Court did here, it would never have found it necessary in 1960 and 1963 to add exemptions. Nor would it have stated in 1963, adding the life insurance companies to Sec. 610, "The purpose of this bill [H.R. 3191] is to exempt life insurance companies from the provision of an act regulating moneylending."[21] This same amendment also added a requirement that persons or legal entities exempted from Sec. 601 by Sec. 610(a) should maintain in the District of Columbia a resident agent, and provided a sanction that if the otherwise exempted entity did fail to appoint and maintain such resident agent, then it was not entitled to the exemption provided by Sec. 26-610(a). If Congress considered that the entities could have recourse to any other exemption except that provided by Sec. 26-610 (a), this sanction would have been obviously useless.
 
 
 34
 We conclude that life insurance companies which regularly make loans in the course of their insurance business are in the business of lending money within the meaning of Sec. 26-601 and until 1963 were not exempt from the requirement of obtaining a license in order to make loans at a rate of interest in excess of 6%. It follows that unless considerations peculiar to the cases of Equitable and Manufacturers operate to remove the transactions here involved from the applicability of the Loan Shark Law, the deeds of trust securing the loans herein are invalid and thus subject to attack by the Trustee in reorganization. To such considerations we now turn.
 
 
 35
 IV. Claim of the Equitable Life Insurance Company
 
 
 36
 A. Pertinent facts.
 
 
 37
 On 22 December 1959 Potomac Cooperators, Inc., borrowed $375,000.00 from Acacia Mutual Life Insurance Co., executing a note at an interest rate of 6 1/4% per year, the loan being secured by a deed of trust on real estate in Maryland. Acacia is a District of Columbia corporation with its sole office in the District. On 22 March 1961 Equitable purchased the promissory note from Acacia at full value. On 28 August 1961 the promissory note was renegotiated and amended to provide for payment of interest at the rate of 6% per year, with new release provisions, new monthly payments, and a new maturity date. Potomac as the maker of the original note and the amended note ratified, confirmed and fully assumed the amended note and deed of trust.
 
 
 38
 On 5 December 1963, Sec. 26-610 of the D.C.Code, the so-called Loan Shark Act, was amended expressly to exclude life insurance companies from the coverage of Sec. 26-601.
 
 
 39
 On 20 February 1964, Parkwood, Inc., purchased the property subject to the deed of trust securing the note held by Equitable, the interest thereon at this time being 6%. Parkwood did not assume the note.
 
 
 40
 At the time the loan was made (1959), Acacia was engaged in the insurance business in the District of Columbia and also engaged in the business of loaning money, the evidence showing that from its sole office in the District substantial loans (from $500,000.00 to several million dollars per year) were made. Acacia did not possess the license required by Sec. 26-601. The amendment of Sec. 26-610 on 5 December 1963 exempting loans made by life insurance companies from the coverage of Sec. 26-601 was prospective only.
 
 
 41
 B. Effect of amending the note.
 
 
 42
 On this appeal Equitable represents that it purchased the note at Potomac's request pursuant to a prior agreement to amend the note. The prior agreement is claimed to have been evidenced in a commitment letter whereby Equitable agreed to take over the loan at a new rate of 6% interest and thus to reform the note and amend the deed of trust. However, because the Referee, affirmed by the District Court, decided that the Trustee's objection to Equitable's claim was insufficient as a matter of law, and thus granted Equitable's motion to dismiss the objection on the ground that the Loan Shark Act did not apply to the original loan transaction here, there is no evidence in the record before us which bears upon the claimed prior agreement between Potomac and Equitable to reform the note to provide for interest at the rate of 6%. We are therefore unable to determine whether the effect of the transaction between Equitable and Potomac was to bring about a novation or to otherwise cure the invalidity of the loan under the Loan Shark Act.
 
 
 43
 Since Equitable has not had an opportunity to introduce evidence to establish the facts relevant to the amendment of the note, we have determined that the case must be remanded for factual findings and, based on the facts as established on remand, a determination as to whether the effect of the transaction between Equitable and Potomac was to render the note valid and enforceable as a result of the amendment.
 
 
 44
 The Trustee argues that the amendment to provide for 6% interest could not in any event validate the loan, since prior to the purchase of the note interest was paid at 6 1/4%, a rate higher than permitted to an unlicensed lender under the Loan Shark Act. Because the excess interest thus paid has never been restored, it is maintained that the total interest paid over the life of the loan must inevitably be greater than 6%, notwithstanding the amendment. In support of this position, the Trustee cites authorities indicating that prior payment of usury renders any subsequent renewal of the transaction usurious, even though the usurious rate of interest is eliminated by the renewal, unless the previously paid usurious interest is restored.[22]
 
 
 45
 The instant case, however, does not involve a violation of the usury law, which in the District of Columbia sets an absolute limitation of 8% on the amount of interest that may be collected by any lender, but rather concerns the loan shark statute which imposes a disability on certain lenders, i. e., non-exempt, unlicensed lenders, to charge interest in excess of 6%. Because Acacia was nonexempt and unlicensed, its loan at a rate of 6 1/4% was illegal under the Loan Shark Act and as a consequence it could not recover on the note, which was void as to both principal and interest.
 
 
 46
 It does not follow, however, that Potomac, which actually received the money lent, could not, in fulfillment of its moral obligation,[23] contract with a third party to assume the note at a legal rate of interest in consideration of the reformation of the note. Potomac could, after all, have made the same original loan contract with an exempt or licensed lender and have no basis for avoiding its obligation to repay the loan. This distinguishes the instant case from the usury situation where any loan made at a rate of interest in excess of 8% would be invalid regardless of who the lender might be.
 
 
 47
 We think that the defense of violation of the Loan Shark Act, thus avoiding the obligation to repay the loan, must be limited in effectiveness to use against those unlicensed, non-exempt lenders who actually contract for or receive interest in excess of 6%. If Equitable, at Potomac's request and with Potomac's express assent and agreement, had purchased the note without any reduction of interest amendment being contemplated or made, but at that time was licensed or exempt under the Loan Shark Law, we do not think Potomac could have avoided payment of the loan on the grounds that it was originally made by an unlicensed lender. Similarly here, where Equitable was unlicensed, if when it agreed to purchase the note it was contemplated and agreed by both it and Potomac that the note would be amended to provide for a legal rate of interest for unlicensed lenders (6%), we think that Potomac, by agreeing to such a transfer and ratifying it could no longer avoid its obligation of repayment on the ground of violation of the Loan Shark Act. If the note and deed of trust thus became valid as to Potomac, as a result of the amendment and ratification, the deed of trust would likewise be valid as to Parkwood, which purchased the property subject to the deed of trust from Potomac subsequent to the amendment of the note.
 
 
 48
 On remand Equitable should have an opportunity to establish that the intent of the parties at the time Equitable purchased the note was to reform the transaction, so as to eliminate any further payment of interest at a rate in excess of 6%, and that Potomac through its ratification intended to be bound on the note to repay the remainder of the loan to Equitable at a legal rate of interest.[24]
 
 
 49
 V. The Claim of Manufacturers Life Insurance Company
 
 
 50
 A. Pertinent facts.
 
 
 51
 On 30 August 1960 Pend-Maple, Inc., borrowed $545,000.00 from the Manufacturers Life Insurance Company. On 13 June 1961 Pend-Maple, Inc., borrowed another $75,000.00. Each loan was secured by a deed of trust on real estate in Maryland and each note carried 6 1/4% interest.
 
 
 52
 The Manufacturers Life Insurance Company is a Canadian corporation with its principal office in Toronto. On the relevant dates it maintained an office in the District of Columbia for selling insurance, but no office under its name for the purpose of making real estate loans. Pend-Maple, Inc., was a Maryland corporation, and executed the application for both loans in Maryland.
 
 
 53
 Pend-Maple, Inc., made the loan application to H. G. Smithy Company, a District of Columbia real estate broker and a mortgage broker. This loan was not solicited for Manufacturers, and at that time H. G. Smithy Company did not solicit loans on behalf of any one lender. It took loan applications and then decided where best to place them. Smithy charged Pend-Maple, Inc., a fee for placing the loan, but also paid Manufacturers a fee to accept the application. Smithy thus functioned as an independent broker making its own profit depending on its success in placing the application. The decision on accepting or rejecting the loan was made by Manufacturers at its home office in Toronto, Canada. The notes and deeds of trust were executed in Maryland and the deeds of trust recorded there. The funds were received by the borrower in Maryland.
 
 
 54
 However, during the time this loan, which was the first loan application Smithy had ever submitted to Manufacturers, was being negotiated, Smithy was also negotiating with Manufacturers to become its regular mortgage loan correspondent in the District of Columbia. This permanent relationship was established by an agreement dated 18 August 1960, just prior to the first loan and deed of trust of 30 August 1960.
 
 
 55
 On 5 March 1963 Parkwood purchased the property covered by the deeds of trust from Pend-Maple, Inc., taking the property subject to the deeds of trust but not assuming the notes.
 
 
 56
 The Referee and the District Court overruled the objection of the Trustee and allowed the secured claim on the same three grounds relied upon to support the claim of Equitable, and in addition held that Maryland rather than District of Columbia law was applicable to the transactions. We think that on the latter ground the District Court and the Referee were correct, and that Manufacturers' claim should be allowed as a secured claim.
 
 
 57
 B. Applicability of Maryland law.
 
 
 58
 The Trustee argues strenuously that Manufacturers was in fact engaged in the lending business in the District of Columbia by virtue of its relationship with Smithy, formally established twelve days before this particular loan was actually executed. The Trustee points to the regulations which define engaging in the regulated business of lending money in the District of Columbia[25] and asserts that what is regulated here is an activity in the District of Columbia, and that all the contacts with Maryland which we have listed above are immaterial when viewed in that light. We think the regulations prove that District of Columbia law could apply to the activities of Manufacturers in making loans, or indeed in making this loan, but the regulations and the statute (Sec. 26-601) under which they were made do not necessarily compel the conclusion that District of Columbia law does or should apply here.
 
 
 59
 The Trustee asserts that subsequent to the 18 August 1960 agreement, Manufacturers was held out by H. G. Smithy Company as making loans in the District, and the Trustee points to Smithy Company's activities in servicing the loans made through Smithy, including this particular one. However, all of these activities of Smithy in servicing these two particular loans occurred after the loans were made, and could not affect the validity of the loans and the deed of trust at the time they were made. If there had been a course of conduct by Smithy in holding itself out as the representative of Manufacturers and in doing the job of servicing the loans for Manufacturers in the District of Columbia prior to the two loans in question, the question of validity might have to be treated differently, but subsequent activities could not invalidate a note and deed of trust which were valid under Maryland law when made.
 
 
 60
 We think there are several grounds on which it can be said that Maryland law applies to the Manufacturers' loans. Generally, the validity of conveyances of real property, and of mortgages and deeds of trust, is determined by the law of the situs of the property. Usually the cases in which the question of the validity of conveyances of real property has arisen have not involved issues such as we have here of the effort of another jurisdiction to regulate a lending activity, but where real estate is concerned, as a general principle, we look to the jurisdiction in which the property is located for the law which governs the security in such transactions.
 
 
 61
 All of the documents involved were executed in Maryland. The loan application, the note and deed of trust were executed in Montgomery County, Maryland; the deed of trust was recorded in that County; and the funds were received by the borrower Maryland corporation in Maryland. The law of Maryland, the place where the contracts were made, should govern "matters bearing upon the execution, interpretation, and validity of the contract."[26]
 
 
 62
 Here we have a real estate transaction, involving a note, a security instrument, and a sizable sum of money, challenged as to its validity because of a moneylending regulatory statute in the District of Columbia, where some of the activities in connection with the loan unquestionably took place. At best, the Trustee can create a conflict between Maryland and District of Columbia law and a choice as to which might govern; where there is a choice of jurisdictions, the preferable course is to select the law of the jurisdiction which would sustain the transaction, and here this is Maryland. This rule contributes to the certainty of commercial transactions, one of the prime objects of all commercial law.[27]
 
 
 63
 We think, however, that no one point is conclusive on Maryland law applying, neither the situs of the property, the execution of all the documents in Maryland, nor the fact that Maryland law would sustain the transaction and District of Columbia law invalidate it; we must therefore apply the principles, and weigh and balance the two jurisdictions' contacts with the transaction in the manner set forth in the Restatement of the Law (Second), "Conflict of Laws," Sections 6 and 188.[28] In accordance with these principles, weighing the factors that point respectively to Maryland or to the District of Columbia as the source of law governing the transaction, we think that, on balance, the most weighty factors favor Maryland law.
 
 
 64
 We do not think the Trustee's reliance on Indian Lake Estates, Inc. v. Ten Individual Defendants, 121 U.S.App.D.C. 305, 350 F.2d 435 (1965), and Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185 (1920), is well placed.
 
 
 65
 In Indian Lake Estates, while the property was in Florida, this court did not reach or discuss the applicability of Sec. 26-601 to such loans made outside the District and secured on real property elsewhere. The case arose on the pleadings, and the holding of the court simply was that the complaint, reciting a loan contract entered into in the District of Columbia under such circumstances as to bring into play the D.C. Loan Shark Law, stated a cause of action.
 
 
 66
 Horning was a classic example of a transparent sham to circumvent the law. Horning was a pawnbroker who took his District of Columbia clients across a bridge into Virginia to execute the relevant documents, and then returned to his business of lending money on security in the District. The purpose of the Loan Shark Act has been said to be the protection of the residents of Washington from excessive interest, and Horning clearly was attempting to evade that purpose. In the case at bar we have no fraudulent or evasive purpose; everything done appears as a natural part of a business transaction without thought to evade the District of Columbia or any other law.
 
 
 67
 The Trustee makes no contention that the law of Maryland, if applied, would invalidate this transaction, and it is clear that Maryland law would not. While Article 58A of the Annotated Code of Maryland (1957 edition) is primarily a usury statute, the Maryland law is somewhat similar to D.C.Code 26-601 et seq., but it is clearly limited to loans of $300.00 or less. This limitation has been recognized by the highest court in Maryland.[29] This transaction, involving over one half million dollars, is therefore not invalidated by any Maryland law called to our attention by any party.
 
 
 68
 Accordingly, we sustain the District Court on this ground in its allowing the secured claim of Manufacturers Life Insurance Company.
 
 
 69
 VI. The Claim of the Hartford Life Insurance Company
 
 
 70
 A. Pertinent facts.
 
 
 71
 On 28 November 1960 Suburban Motors, Inc., borrowed $100,000.00 from Walker & Dunlop, Inc., a District of Columbia real estate broker-mortgage banker with its principal office in the District. A note at 6 1/2% and deed of trust on real estate in Maryland were executed. On 19 January 1961 Walker & Dunlop transferred the note and deed of trust to Hartford. On 2 March 1962 Suburban sold the real estate to Adams, which took the property subject to the deed of trust but did not assume the note.
 
 
 72
 The loan was made by Walker & Dunlop from its principal office in the District for itself and on its own account. As of 28 November 1960 Walker & Dunlop were not licensed to engage in the business of lending money under Sec. 26-601. However, under Sec. 26-610 real estate brokers are included in the category of businesses exempt from the requirement of a license under Sec. 26-601. It is undenied that Walker & Dunlop was at all relevant times a real estate broker, and it also appears it was in the business of mortgage banking.
 
 
 73
 The Trustee contended that since it was unquestioned that Walker & Dunlop made the loan with its own money and for its own account, Walker & Dunlop was acting as a mortgage banker and therefore was not exempt from the licensing requirement of Sec. 26-601. The Trustee argued that a real estate broker, as a matter of general law and understanding, is one who acts for another with respect to real estate in making or negotiating a loan or otherwise, and that the phraseology of the District of Columbia statute Sec. 26-610 was intended only to exempt a person or company acting for another in making or negotiating a loan. The District Court found that under Sec. 26-610 anyone who makes a loan for himself, secured by real estate, falls within the exemption of a real estate broker, which position Hartford argues here.
 
 
 74
 Hartford also argues that irrespective of whether the loan was originally exempt under Sec. 26-610 as made in a real estate broker's business, it took as a holder in due course and thus its security is valid and cannot be set aside. This the District Court did not find.
 
 
 75
 B. The exemption under Sec. 26-610.
 
 
 76
 Hartford argues that an integral part of the real estate brokerage business includes not only negotiation of loans on behalf of other investors, but also the placing of loans on behalf of the brokers themselves. This may be true, but this part of the real estate brokerage business is more properly described as the mortgage banking business.
 
 
 77
 Semantics aside, the District of Columbia statute involved does not say that making loans on real estate is exempt. When originally passed, the exemption section 26-610, listed the exempted organizations "as defined in the Act of Congress of July First, 1902, 32 Stat. 621." Paragraph 15 of that Act defines real estate brokers as follows:
 
 
 78
 . . . That real estate brokers or agents shall pay a license tax of $50.00 per annum. Every person who sells, or offers for sale, as the agent for others, real estate, wherever located, including mining and quarry property, or who makes or negotiates loans thereon, or who rents houses, buildings, stores, or real estate, or who collects rent for others, shall be regarded as a real estate broker or agent.[30]
 
 
 79
 The key questions revolve around the italicized words.
 
 
 80
 First, if, as Hartford contends, the words "makes or negotiates loans thereon" mean that the making or negotiating of the loan may be for the broker's own account, then anyone "who makes or negotiates loans thereon . . . shall be regarded as a real estate broker or agent." This simply cannot have been the legislative intention, to define as a real estate broker or agent anyone who is in the business of making or negotiating loans on real estate for his own account.
 
 
 81
 Second, in the interpretation of this clause, the words "as the agent for others," although dreadfully misplaced, must modify all of the activities described in this one sentence, i. e., "who sells or offers for sale," "who rents houses, buildings, stores, or real estate, or who collects rent for others." The concept of "agent for others" must apply to all of these activities, which, if done for others, do constitute proper functions of a real estate broker or agent.
 
 
 82
 Third, if "as the agent for others" does not refer also to "who makes or negotiates thereon," then we have the peculiar situation that the person who is a real estate broker or agent is one who makes or negotiates loans for his own account, but there is no clause in this entire sentence referring to the broker or agent making or negotiating loans as the agent for others. The interpretation urged by Hartford, i. e., that "agent for others" only refers to the part preceding "who makes or negotiates," would leave out completely the authority of the broker or agent to make or negotiate loans for others, which is the whole sense of the business.
 
 
 83
 So we conclude that the loan as originally made by Walker & Dunlop did not fall within the exemption of Sec. 26-610, and therefore the loan was subject to the licensing requirement of Sec. 26-601. In contrast to the position of the insurance companies, real estate brokerage firms have always been exempt from licensing under Sec. 26-610. Mortgage banking, however, has never been exempt from Sec. 26-601. Thus the loan in question, as it was a result of mortgage banking activity, was not exempt from Sec. 26-601, and the security instrument executed in connection with the loan is void under Sec. 26-601, unless the claim of Hartford as a holder in due course can prevail.
 
 
 84
 C. Hartford as a holder in due course.
 
 
 85
 There is much argument in the briefs as to whether the effect of Sec. 26-601 is to make security instruments given in violation thereof truly "void" or merely "voidable," allowing defenses to be asserted, and, even if the security instruments are truly void, whether a holder in due course can still prevail. We need decide none of these questions here, because we conclude that Hartford was not found to be a holder in due course and on the facts could not have been so found.
 
 
 86
 The question whether a holder is a holder in due course is a question of fact.[31] The burden was on Hartford to prove to the fact-finder, the Referee, and the District Court, that it was a holder in due course.[32] The District of Columbia Uniform Commercial Code provides:
 
 
 87
 After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he * * * is in all respects a holder in due course.[33]
 
 
 88
 Hartford argued to the Referee that its rights under the deed of trust are not affected by any invalidity stemming from Sec. 26-601 because Hartford is a holder in due course, but the Referee as the original finder of fact made no such finding, and the District Court made no fact-finding or conclusions of law of its own, merely adopting those of the Referee.
 
 
 89
 Nor do we see that the Referee or District Court could have made any such finding of fact. When Hartford purchased the note and deed of trust, it appeared on the face of the instrument that the loan was made at over six percent. On the face of the note the lender of the note was described as Walker & Dunlop, Inc., of Washington, D.C., and Hartford knew from its negotiations with Walker & Dunlop in making the loan that this company was engaged in making such loans in the District of Columbia. The loan is also shown on the face to be payable in Washington, D.C. Thus, from all of the uncontradicted facts, Hartford knew that it was purchasing a note and accompanying security covered at its inception by the laws of the District of Columbia, and Hartford should have been on notice that by virtue of Sec. 26-601 a defense existed against the note. Since to have been a holder in due course Hartford would have had to have taken the note with "no notice of any infirmity in the instrument or defect in the title of the person negotiating it,"[34] Hartford could not have qualified for holder in due course status.
 
 
 90
 Hartford asserts that it did not know that the loan was illegal under Sec. 26-601 and that in the exercise of reasonable diligence it could not be expected to know. At the time of the note's execution (1960) and at the time of its negotiation to Hartford (1961) the governing law for commercial paper in the District of Columbia was the Negotiable Instruments Law.[35] Hartford claims that it became a holder in due course because at that time it met all the required conditions, including that "at the time when the note was negotiated to it, Hartford had no notice of any infirmity in the instrument or defect in the title of Walker & Dunlop."
 
 
 91
 But the burden of establishing this was on Hartford; it could hardly plead ignorance of the law as an excuse, a holder cannot convert himself into a holder in due course by being ignorant of the law. While the question of whether Walker & Dunlop, Inc., as a real estate broker was entitled to an exemption under Sec. 26-610 may not be perfectly plain on its face, it was perfectly plain that Walker & Dunlop had acted for itself in making the loan originally, and the whole tenor of the real estate broker's exemption under Sec. 26-610 is to take the real estate broker out from the licensing requirement of Sec. 26-601 simply because the real estate broker is an agent and does not act for himself. Where persons are in the business of making loans on real estate themselves, Sec. 26-601 requires them to be licensed, unless they are specifically exempt under Sec. 26-610. We have held that transactions and obligations in violation of Sec. 26-601 are "void,"[36] and therefore the maker of the note or the security instrument, or his assignee, would have had a defense. This should have been apparent from the face of the note and the governing District of Columbia law, and Hartford should have been on notice of this defense, and on notice that it was not a holder in due course. It is possible to argue, as the Trustee strenuously has, that the obligations incurred in violation of Sec. 26-601 are void and of no effect even in the hands of a holder in due course. We have not passed upon this question, as it is not necessary under the disposition we now make. But all of this was the law when Hartford purchased the note and accompanying deed of trust. Under these circumstances it is not surprising that, although Hartford sought it, neither the Referee nor the District Court made a finding of fact that it was a holder in due course. Nor do we so find here.
 
 
 92
 D. Applicability of District of Columbia Law
 
 
 93
 Unlike our conclusion in regard to the situation of Manufacturers, we find Hartford's argument that the transaction was not subject to District of Columbia law to be unpersuasive, and we therefore decline to overrule the referee's position that the Hartford transaction is governed by D.C. law.[37]
 
 
 94
 In the case of Manufacturers, it did not maintain a Washington office for the purpose of making real estate loans, and "the decision to make the loan was made by Manufacturers at its home office in Toronto, Canada. Manufacturers had no agent in the District of Columbia, at that time, authorized or empowered to make such loans."[38] The referee also specifically found "The Manufacturers Life Insurance Company made no loans in the District of Columbia between January 1, 1959 and May 7, 1968 at a rate of interest in excess of 6% per annum."[39]
 
 
 95
 No such specific finding as the latter was made in the case of Hartford. In further contrast, the referee referred to Walker & Dunlop, Inc., who unquestionably made the Hartford loan originally, as "a corporation with its principal office in the District of Columbia."[40] There is little doubt that D.C. law is designed to regulate this kind of lender, and the weight of whatever countervailing factors which may exist[41] is not sufficient to upset the premise of the referee and District Court that District of Columbia law applied to the Hartford (Walker & Dunlop) loan.
 
 
 96
 We therefore conclude that Hartford not having established itself as a holder in due course, Walker & Dunlop's actions not being exempt under Sec. 26-610, and the applicable law being that of the District of Columbia, that the loan and accompanying deed of trust are therefore subject to Sec. 26-601. We hold that the objection of the Trustee to the allowance of the claim of Hartford as a secured claim on the basis of the deed of trust was valid, the action of the District Court in denying the objection was erroneous, and we therefore remand to the District Court for the entry of the proper order.
 
 
 97
 VAN PELT, Senior District Judge (concurring in part and dissenting in part):
 
 
 98
 It is with reluctance that I conclude that I cannot concur entirely in the well-written opinion of Judge Wilkey, concurred in by Chief Judge Bazelon.
 
 
 99
 A lengthy dissent is unnecessary. Suffice it to say that I am not in disagreement with the affirmance of the Manufacturers' claim or with the finding that the Trustee has standing to attack the validity of the deeds of trust. I have also concluded, with some reluctance, to approve the return of the Equitable claim to the District Court for a further hearing in which all defenses can be thoroughly developed. However, as to Hartford, for the reasons hereafter stated, I would affirm.
 
 
 100
 It should be noted, although discussed by Judge Wilkey, that all the real estate covered by the deeds of trust which are before us is located in the State of Maryland, not the District of Columbia. It is conceded that the indebtedness secured by each of these deeds of trust, if measured by Maryland law, is valid.
 
 
 101
 The statute in question is a licensing statute. It is not a usury statute as such. See Indian Lakes Estates, Inc. v. Ten Individual Defendants, 121 U.S.App. D.C. 305, 311, 350 F.2d 435, 441 (1965). The majority opinion recognizes that this case does not involve a violation of the District of Columbia usury law "but rather concerns the loan shark statute which imposes a disability on certain lenders, i. e., non-exempt, unlicensed lenders, to charge interest in excess of 6%."
 
 
 102
 I do not believe it was the intention of the Loan Shark Act to cover transactions of this nature. Thus, if they are in violation of the District of Columbia law, and admittedly are valid under Maryland law, I would, in the absence of an intent to avoid or violate the District Loan Shark Act, consider that in applying the more usual factors. To apply the Loan Shark Act results in a windfall to the Bankrupt, a situation which should be frowned upon almost to the same extent as loan shark operations. This too becomes a background factor.
 
 
 103
 I approve the statement of factors, set forth in that portion of the majority opinion dealing with Manufacturers, which are to be considered in determining whether to apply the law of Maryland or of the District of Columbia, and I will not repeat them. However, as I weigh and balance the contacts, I conclude, as with the Manufacturers claim, that application of Maryland law should also be favored in deciding the Hartford claim.
 
 
 104
 The Hartford contacts in Maryland are nearly the same as for Manufacturers. The property is in Maryland; the maker of the note and deed of trust was a Maryland corporation; the papers were executed in Maryland; the money was paid in Maryland. Thus, I conclude it became a Maryland contract to which Maryland law should be applied.
 
 
 105
 In addition, I disagree with my brethren that Walker & Dunlop are not exempt from the Loan Shark Act. There is no claim here that Walker & Dunlop were loan sharks, as such, or persons of the type which the congressional history shows the law was intended to regulate and license.
 
 
 106
 It is difficult to trace the history of the Loan Shark Act because codifiers of the District of Columbia code are said to have lost the original. It is clear, however, that "real estate brokers" was a term which was defined in the original Act of Congress of July 1, 1902. 32 Stat. 621. Its definition of real estate brokers is set forth in the majority opinion. I will not repeat it here. I agree that it is a poorly worded statute if it is to be read as the majority opinion would read it. However, I do not read the words "as the agent for others" in paragraph 15 of the Act of July 1, 1902, as a limitation upon the subsequent words "who makes or negotiates loans thereon." As I read the Act and its history, it was intended to exempt real estate brokers from the Loan Shark Act, including not only persons who sell real estate or offer it for sale as the agent for others, but also persons who make or negotiate loans on real estate or who "rent houses, buildings, stores, or real estate or who collect rent for others. . . ." Thus, I conclude that Walker & Dunlop were exempt from the licensing requirement of Section 26-601.
 
 
 107
 I would affirm both as to Hartford and Manufacturers.
 
 
 108
 On Petitions for Rehearing*
 
 WILKEY, Circuit Judge:
 
 109
 After consideration of the points raised by the petitions for rehearing, the court denies the petitions, affirms the original decision and opinion, and adds the following supplement to its original opinion.
 
 I. Scope of Action by the Court
 
 110
 We must remember that it is not "a constitution we are expounding." The questions here involve a regulatory licensing statute[1] to which there are eight specific exemptions,[2] carved out by Congress on three occasions.[3] As pointed out in our original opinion (p. 167), the Congress has the power at any time to define further exemptions to the licensing requirement. While courts sometimes are called upon and do fill in interstitially gaps in the coverage of statutes enacted by the legislature, in this case it would be an act of direct legislation to add an exemption to the regulatory licensing requirement. The matter of appropriate and permissible interest rates, for specific persons and purposes, is an area of delicate economic and social policy peculiarly appropriate for judgment by the Congress.
 
 
 111
 We have been urged to make our decision in this case prospective only; in other words, not to invalidate any existing loans under Sec. 601, but to say that in the future Sec. 601 will be construed as applying to loans originated by mortgage bankers, unless Congress sees fit to add other exemptions.[4]
 
 
 112
 In support of such plea, the Mortgage Bankers Brief cites three situations in which decisions have been made prospective only. The Supreme Court in Linkletter v. Walker[5] did limit its constitutional interpretation to prospective application only, and in so doing cited previous precedents dealing "with the invalidity of statutes or the effect of a decision overturning long-established common-law rules," where the interest of justice called for making the rule prospective because retrospective operation would impose significant hardships.[6] In contrast with the three situations of constitutional interpretation, the changing of a common-law rule, or holding invalid a statute, we have here a situation in which this court has upheld the validity of a statute, and in our own judgment conformed this opinion to three clear previous decisions of this court.[7] We are in effect saying that this statute is valid, and has had this meaning since it was enacted. There are no decisions of ours to the contrary, and we overrule none here.
 
 
 113
 The impact of a decision applied prospectively only is impossible for this court to gauge. Obviously there are and have been people whom Congress wanted to protect by this Loan Shark Law in 1913. Applying our interpretation only prospectively would deprive these people of the protection Congress tried to give them. It is impossible for this court to determine who should now be protected and to frame an opinion to do so. Only Congress can do this by framing its legislation to cover the persons and entities whom it thinks deserving of protection, making its own economic and social policy judgments. This is not the function of a court.
 
 
 114
 II. Construction of Secs. 1, 5, and 10 of the Loan Shark Act of 1913
 
 
 115
 A. The plain words of the statute.
 
 
 116
 1. It seems fair to say that the 1913 Act was primarily intended to regulate and limit the business of making small loans for security, but it is equally fair to say that this was not the sole purpose of the Act. To say that it is the sole purpose of the Act, this court would have to ignore Sec. 601 and Sec. 610, and overrule the well reasoned and long recognized cases of Hartman v. Lubar (1942),[8] Royall v. Yudelevit (1959),[9] and Indian Lake Estates, Inc. v. Ten Individual Defendants (1965).[10] On the other hand, if the petitioners on rehearing are to prevail on their theory on this point, they must establish that the 1913 Act was solely intended to regulate loans of $200 or less; and if they fail to establish this, if the Act was to do other things as well, then petitioners cannot prevail.
 
 
 117
 The very title of the 1913 Act, "To regulate the business of loaning money on security of any kind by persons, firms, and corporations other than national banks, licensed bankers, trust companies, savings banks, building and loan associations, and real-estate brokers in the District of Columbia,"[11] indicates that this is not concerned exclusively with small loans, nor is it an amendment or exception to the usury statute.[12] The usury statute already had an exemption for pawnbrokers. If it had been desired to expand this to exempt all secured loans of $200 or less, the simple action would have been to redefine the small lenders so exempt or to add another exemption of a character like the pawnbrokers to the usury law. But Congress did not do this. It enacted an entirely new and different law, whose three sections-601, 605, and 610-when construed together do provide a rational scheme of regulation, licensing, and exemption from regulation of all loans.
 
 26 D.C.Code Sec. 601 provides:
 
 118
 It shall be unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than six per centum per annum is charged on any security of any kind . . . without procuring license; . . .
 
 
 119
 These words are plain and unambiguous on their face. If anyone is to loan money at greater than 6%, he needs a license. The following sections tell how to go about it and what the requirements are.
 
 
 120
 Section 605 talks about those entities which have obtained a license:
 
 
 121
 No such person . . . or corporation shall charge or receive a greater rate of interest upon any loan made by him or it than one per centum per month on the actual amount of the loan . . . . No such loan greater than two hundred dollars shall be made to any one person: Provided, That any person . . . receiving a greater rate of interest than that fixed in this chapter, shall forfeit all interest . . and in addition thereto shall forfeit to the borrower a sum of money . . . equal to one-fourth of the principal sum: . . .
 
 
 122
 This section, 605, was the main focus of the original Act. It seems clear that the motivating force was to set up licensing and regulation of lenders of small sums upon security which would not only include pawnbrokers (already regulated by an 1889 law), but all other persons not classified as pawnbrokers who might be engaged in the small loan business. But in so doing, Congress found it necessary to make other general prohibitions and exemptions found in Secs. 601 and 610. As shown by the chronology of the decided cases, these portions of the statute did not assume prominence in litigation until larger secured loans at more than 6% interest began to be made, as in Von Rosen v. Dean (1930).[13] Where the effort by the borrower was to get these loans within the coverage of Sec. 605, it failed, as in Von Rosen and Zirkle v. Daly (1931),[14] because the coverage of Sec. 605 was obviously directed at loans of $200 or less on which interest of 12% was permitted.
 
 
 123
 Section 610 provides an out for some of the institutional lenders. As written as Section 10 of the 1913 Act, the basis for D.C.Code Sec. 26-610, it provides:
 
 
 124
 That nothing contained in this Act shall be held to apply to the legitimate business of national banks, licensed bankers, trust companies, savings banks, building and loan associations, or real-estate brokers, as defined in the Act of Congress of July first, nineteen hundred and two.
 
 
 125
 The language in regard to small business investment companies and life insurance companies was added in 1960 and 1963, respectively, as discussed later.
 
 
 126
 Whether many members of Congress thought about it or not, by the Loan Shark Act of 1913 they had enacted a statute, whose motivating force may well have been exemplified in Sec. 605, but which actually had this effect: all lenders "in the business of loaning money" "on any security of any kind" could not charge more than 6% per annum unless (1) the lender secured a license under Sec. 605 (in which case it could make individual loans not greater than $200 and charge up to 12% thereon), or (2) it was specifically exempt under Sec. 610. The type institutions exempted are the larger institutional lenders, plus real estate brokers as defined.
 
 
 127
 2. Where the petitioners' argument that the Loan Shark Act has no application to loans in excess of $200 breaks down on the very face of the statute itself is Sec. 610, the list of exceptions to the coverage of Sec. 601. If the sole purpose-as distinguished from what was perhaps the primary purpose-of the Loan Shark Act of 1913 was to cover loans of $200 or less, if the flat prohibition of loans charging interest over 6% in Sec. 601 means nothing, then there would have been no reason to list the exceptions in Sec. 610. If the Loan Shark Act only regulated loans of $200 or less, and permitted 12% interest for them, then it would never have been necessary to write an exemption section.
 
 
 128
 Petitioners are forced to the extreme position of arguing that the entire Act was concerned only with loans of $200 or less.[15] This means that it was necessary to exempt "national banks, licensed bankers, trust companies, savings banks, building and loan associations" only for their secured loans of $200 or less, for which such institutions could charge more than 6%. And further, that if the loans were more than $200, then the 1913 Act did not apply at all to anyone. All of this is said to be derived from the intent of Congress.[16] Reverting to the plain language of the statute, where statutory construction is supposed to start, we find no such intent and, in fact, petitioners do not point to any language in any section manifesting such intent.
 
 
 129
 Nor do petitioners even attempt to explain away the listing of "real estate brokers, as defined" after the enumeration of the large institutional lenders. Was it necessary to list them as exempt from the coverage of the Act if the entire Act dealt only with loans of $200 or less? The very inclusion of real estate brokers or agents in the list of exemptions (whether we consider them acting as agents or for their own account, which is a different question discussed under III below) shows that large loans involving real estate as security and in amounts greater than $200 were contemplated as being covered by the Act from the beginning.
 
 
 130
 All of this was settled by Hartman v. Lubar (1942),[17] the first time the issue was squarely presented under Sec. 601. Hartman did not overrule any of the earlier cases; there was no need to, because they were each and every one concerned with the applicability or nonapplicability of Sec. 605. On this basis Von Rosen[18] and by implication Zirkle[19] were distinguished in Hartman to show which sections applied to which type loans by which entities.[20] Royall v. Yudelevit[21] and Indian Lake Estates, Inc. v. Ten Individual Defendants[22] followed Hartman and applied the rule to real estate loans.
 
 
 131
 3. Therefore, the idea that mortgage bankers and insurance companies in the District of Columbia could ever blithely assume-at least after Hartman (1942)-that the Loan Shark Act of 1913 did not apply to loans over $200 is beyond belief. In fact, of late all counsel had to do to see the fallacy of this view was to look at the very first case cited under Title 26, D.C.Code, Sec. 601:
 
 
 132
 "Notes to Decisions" "Amount as determining applicability
 
 
 133
 This section making it unlawful to engage in business of loaning money upon which a rate of interest greater than 6% per annum is charged on any security of any kind without procuring a license has application to a loan larger than $200. Hartman v. Lubar (citation, certiorari denied, rehearing denied)."[23]
 
 
 134
 Nor did the companies so assume. The statement in the Equitable petition for rehearing, "From 1913 until 1962 the life insurance companies in the District of Columbia so construed the Loan Shark Act as applying exclusively to loans of less than $200 to any one borrower,"[24] is directly refuted by the position of the Equitable itself, stated in support of the legislation which resulted in 1963 in the insurance companies being added to the list of exemptions under Sec. 610. On 27 April 1962 the Equitable Life Insurance Society of the United States, over the signature of Bernard K. Sprung, Counsel-Legislation, wrote Representative Abernathy, Chairman, Subcommittee No. 2, Committee on the District of Columbia, recording ". . . its support of this bill which would amend Section 26-610 of the District of Columbia Code to include life insurance companies as institutional lenders exempt . . . ." The Equitable pointed out that ". . . Section 26-610 now specifically exempts [naming those listed in the statute]" and "Life insurance companies are certainly of equal calibre to those listed . . . ." The Equitable stated the reason for the needed legislation: ". . . because of the question as to whether insurance companies were governed by this section or by the general Usury Statute, Section 28-3303 of the District of Columbia Code, many companies have taken the conservative position that they would not entertain requests for loans in the District which in normal circumstances will justify at a given time an interest rate in excess of 6%." The letter concluded, "Accordingly, we feel that life insurance companies should be included among the exempted investors."[25] (Emphasis supplied.) This certainly reveals an awareness of the meaning of the Loan Shark Law as already construed by our court, and that meaning is not that it applies "exclusively to loans of less than $200."
 
 
 135
 Among sophisticated large lenders, such as the insurance companies and mortgage bankers, the true state of legal opinion on the question of what size loans were covered by the 1913 Loan Shark Act was well put in this case by petitioner Hartford in its original brief (p. 24), "Of course, Hartford realizes that there is no set amount in Sec. 601, as in other sections of the Act, and the court must use its discretion in each case to determine if the specific loan is of the character intended to be restricted."
 
 
 136
 As shown by the hearings before Subcommittee 2 of the House District of Columbia Committee in 1962,[26] the insurance companies had for some time been advised by their counsel that they could not lend at a rate above 6%,[27] they were not lending,[28] the money was not coming into the District, therefore not only the insurance companies but other financial institutions in 1962 and 1963 sought from the Congress an exemption for the insurance companies taking them out of the coverage of Sec. 601-which was recognized as covering all loans-and listing insurance companies for the first time in Sec. 610.
 
 
 137
 B. Legislative history of the 1913 Loan Shark Act and related statutes.
 
 
 138
 1. From the plain words of the 1913 Act we derive no inference whatsoever that it was designed to cover solely loans of $200 or less. The complete absence of language so stating should be dispositive. But petitioners vehemently argue that such a limited purpose is apparent from the legislative history, without being specific as to just where it is made manifest. We do not discern such intent in the legislative history.
 
 
 139
 Quite the contrary. Congress was aware that loans on real estate would be covered under the Act.[29] This was deliberate, as Congress was aware that second or third mortgages would command a high rate of interest, and they were seeking to regulate this. Unless the real estate transaction in question was conducted by one of the specifically exempted organizations, the transaction would fall under the Act.
 
 
 140
 *******
 
 
 141
 * * *
 
 
 142
 Most significantly, after the dialogue referred to above, Congress specifically rejected an exemption for all real estate security transactions. It thus definitely wanted to allow some lending institutions exemptions, and to deny exemptions to all others. Mr. McLaughlin proposed an amendment which would have provided, "Nothing contained in this Act shall be held to apply to contracts or loans upon or relating to real estate . . . ."[30] In support of his amendment Mr. McLaughlin argued that "after going through the bill, it must be evident to all that it does not forbid exorbitant rates of interest upon loans upon real estate."[31] This amendment was rejected; thus it is undeniable that Congress was aware that real estate transactions indeed would be under the Act, and that if the rate charged were in excess of the 6% ceiling, then they were just as "unlawful and illegal" as any other loans in violation of Sec. 601.
 
 
 143
 Mr. Johnson of Kentucky submitted the Conference Committee Report, which among other things rejected a Senate proposal "to permit individuals to loan their own money . . . without being required to obtain a license for engaging in such business," and also rejected a Senate proposal to delete the entire exemption section 10.[32] Thus the exemptions were carefully considered up to the very last in conference, were determined to be necessary, and among the exemptions proposed but not included was an exemption to permit the loaning by individuals of their own money without obtaining a license.
 
 
 144
 In 1911, when this Loan Shark Act first began to be seriously considered, the only law which regulated lending money in the District was a general usury statute limiting interest to 6% per annum. However, there was an exception in this general statute for pawnbrokers, who were allowed to charge 3% per month.
 
 
 145
 If the intent of Congress had only been to permit small loans of $200 or less to be made at 12%, in other words to create another exception to the usury law, the obvious simple way to do it would have been to do it for small lenders exactly the way Congress had done it for pawnbrokers, that is, to put an exception in the usury statute. But to take care of small lenders of $200 or less was not the total purpose of Congress in the 1913 Act, hence a separate and more comprehensive law than a mere exception to the usury statute was thought necessary, and was enacted. To construe it as only limited to small loans would be to frustrate part of what Congress set out to do.
 
 
 146
 2. The Usury Law was amended in 1920 in this fashion:
 
 
 147
 "By striking out Section 1180 and inserting in lieu thereof:
 
 
 148
 'Section 1180. What Is Usury.-If any person or corporation shall contract in the District, verbally, to pay a greater rate of interest than 6 per centum per annum, or shall contract, in writing, to pay a greater rate than 8% per annum, the creditor shall forfeit the whole of the interest so contracted to be received: Provided, That nothing in this chapter contained shall be held to repeal or affect the Act of Congress approved February 4, 1913, relating to the business of loaning money on security.' (Thirty-seventh Statutes, part 1, page 657.)"[33]
 
 
 149
 This emphasizes that Congress had well in mind the differences in purpose and effect of the Loan Shark Law and the Usury Law, that the 1913 Act has a life of its own, and that our court was cognizant of this in Indian Lake Estates when it said, "We now consider a quite different problem,"[34] as it turned from the Usury Law to the licensing statute.
 
 
 150
 Arguments have been made that the 1920 Usury Law Amendment either (1) was passed without Congress being aware of the discrepancy between the rate of 8% in the Usury Law and 6% in the Loan Shark Act; or (2) the 1920 Usury Amendment "impliedly amended the Loan Shark Act," and that by implication the 6% rate limit of the Loan Shark Act became 8%; or (3) no penalties should be applied in the case at bar because the rate of all these contracts does not exceed the 8% usury rate limit. In light of the plain language on the face of the statute in the 1920 Usury Act Amendment, showing the awareness of Congress as to the existence of two different regulatory schemes, we consider such arguments simply unsupportable.
 
 
 151
 C. Older cases now relied on by Hartford, Equitable, and Mortgage Bankers Association to establish that the District of Columbia Loan Shark Act has no application to loans in excess of $200
 
 
 152
 Petitioners Hartford, Equitable, and amicus curiae Mortgage Bankers Association now urge that Von Rosen v. Dean (1930)[35] and four other of our decisions[36] "hold expressly that the Loan Shark Act applies solely to small loans not in excess of $200 to any one borrower."[37]
 
 
 153
 This is astounding. In the original briefs Von Rosen was not cited by any party before this court. This could not have been oversight; all five cases were discussed by the referee in his chronological review of every case decided under any part of the Loan Shark Act. Originally not one of the five was cited by Equitable; Hartford cited three for other minor points, but did not cite Von Rosen for anything. Furthermore, Hartford indicated it "relied principally" on Hartman,[38] Royall,[39] and Indian Lake Estates,[40] which petitioner Hartford now implies we must overrule[41] in order to reach the result desired by the mortgage bankers and Hartford. Of equal significance, the very comprehensive brief for the trustee appellant, which anticipatorily discussed cases to be relied on by the petitioner lenders, never mentioned either of the five older cases.
 
 
 154
 We can only conclude that in the original dispassionate analysis of all counsel for both sides, Von Rosen and the other four cases were considered to have no applicability to the case at bar.
 
 
 155
 Nor do they. Von Rosen v. Dean (1930),[42] the case now principally relied on, was the first case involving a sizable amount of money, a loan of $177,500 on real estate security. The plaintiff-debtor sought to recover usurious interest under Secs. 1180 and 1181 of the Code, and also to invoke the provision of Sec. 605 of the Loan Shark Act to recover one-fourth of the principal involved. We stated, after discussing the principal issues under the usury sections, that "the Loan Shark Law can have no application to a case of this sort, since the act was intended to apply only to persons making small loans upon personal security, as shown by the fact that the amount of such loans is limited by the act to $200."[43] The $200 limitation, of course, appears only in Sec. 605 of the Act, not in Sec. 601, as was specifically recognized by petitioner Hartford in its original brief here.[44] We went on to point out in Von Rosen that if the Act applied in the fashion urged, then a clever borrower might pay a "small bonus for an extension in the payment of interest" and "might recover one-fourth of the great principal sum as is undertaken to be done in this case. Such cases are plainly covered by the sections of the Code already referred to."[45]
 
 
 156
 It is from this language that petitioners now make their argument. But this ignores the obvious fact that the citation to the limitation of the loan and to the remedy of recovering one-fourth of the principal sum is a reference to Sec. 605 of the Act, not Sec. 601. There is no discussion of the coverage of Sec. 601 and Sec. 610 except by whatever may be implied in the portion quoted.[46] In Hartman v. Lubar (1942) we clearly distinguished Von Rosen on its facts, and by the reference of the court to Sec. 605 of the Act and the limitations and remedies involved therein.
 
 
 157
 Zirkle v. Daly (1931)[47] involved a lawyer resident in New York occasionally making investments in second trust notes secured upon real estate located in the District of Columbia. The debtor invoked Sec. 605 of the Loan Shark Act to claim forfeiture of one-fourth of the principal as well as all the interest. The court relied principally upon Von Rosen, reciting the limitations of principal of $200 and the right of recovery of one-fourth of the principal, which are in Sec. 605 only. It is significant that the then Justice (later Chief Justice) Groner participated in Zirkle (1931), because he also participated in Hartman (1942) which distinguished Von Rosen (1930)[48] and by implication Zirkle. Chief Justice Groner apparently found no inconsistency between ruling out in Zirkle the application of Sec. 605 and the remedies therein to a loan in excess of $200, and his later holding in Hartman that Sec. 601 did apply to all loans unless the exceptions of Sec. 610 could be invoked.
 
 
 158
 These five earlier cases have not been overruled, and indeed there is no reason why they should be. They were all decided on different fact situations and involve a different section of the statute (Sec. 605) from the case at bar.
 
 
 159
 As long as the usury statute restricted legal interest to 6%, it is obvious that Sec. 601 and Sec. 610 would be relatively inactive sections of the statute. Thus it was that these first five cases all concerned Sec. 605 and the issues revolved around the penalties and coverage of this section, which does deal with small loans exclusively.
 
 
 160
 But once the 6% usury limit was removed (1920), and the interest rate on large real estate secured loans climbed, it was inevitable from the overall regulatory scheme analyzed above that cases involving Sec. 601 and Sec. 610 would arise. Hartman (1942) and Royall (1959) were such cases, and with the full scope of the 1913 Act writ plain and clear for all, those who could read and whose lending activities were restricted by the Act turned to Congress for the necessary relief.
 
 
 161
 D. The additional congressional exemptions of 1960 and 1963.
 
 
 162
 The small business investment companies recognized the accepted reach of Sec. 601, and quickly demonstrated how safely to avoid it. Created in 1958,[49] by 1960 the SBIC's had secured from Congress an exemption by being listed under Sec. 610. The Congress also recognized the scope of the Loan Shark Law:
 
 
 163
 Although it [Sec. 26-601 et seq.] was obviously not intended to apply to SBIC's, it does apply to them literally and constitutes an obstacle to effective operation of SBIC's in the District of Columbia.[50]
 
 
 164
 The same, of course, could be said for all other lenders not specifically named in Sec. 610 as exempt. Insurance companies were the next to realize this and to seek exemption.[51]
 
 
 165
 On 1 May 1962 Mr. George Brady, Chairman, Legislative Committee, Mortgage Bankers Association of Metropolitan Washington, appeared before the House Committee on the District of Columbia (Subcommittee 2). Mr. Brady, representing the Mortgage Bankers Association but appearing on behalf of the insurance companies, testified:
 
 
 166
 A few years ago the General Counsel for the majority of life insurance companies, then making mortgage loans in the District, decided that, as a result of court decisions and the omission of insurance companies from those lending institutions exempted from the socalled loan shark law, they should not lend money in the District of Columbia at rates in excess of 6%[52]
 
 
 
 * * *
 This Loan Shark Law, despite the usuary statute-Sec. 28-3303 of the D.C. Code which allows a maximum interest rate up to 8% provided the loan contract is in writing-prohibits the lending of money in the District at an interest rate greater than 6% unless the lender complies with the licensing and other provisions of that law.
 Practically all institutional lenders except life insurance companies were specifically exempted from the provisions of the Loan Shark Law.
 Exempted were national banks, licensed bankers, trust companies, savings and loan associations, and real estate brokers.
 The legislative history of the Loan Shark Law clearly shows that it was aimed at driving out the unlicensed makers of small loans charging an exorbitant rate of interest to the borrower.
 As late as 1930 it was considered that the Act applied only to small loans of $200 or less and not to normal real estate mortgage transactions. This is the Von Rosen v. Dean case.
 However, recent decisions of the local Court of Appeals appear to hedge in the Von Rosen case, with the result that doubt has been raised as to whether an institutional lender not included in the exemption of the Loan Shark Law is restricted from lending money in the District at interest rates in excess of 6%.
 The result has been that life insurance companies have taken a conservative position and thus will not entertain requests for loans in the District of Columbia, which in normal circumstances would justify at a given time an interest rate in excess of 6%.[53]
 This testimony of the mortgage banker representative on behalf of the insurance companies undercuts substantially the entire position of Hartford, Equitable, and Mortgage Bankers Association here on the petitions for rehearing. It is perfectly clear that long before 1962 the major lenders had recognized that on the plain language of the Loan Shark Act, as interpreted in Hartman (1942) and Royall (1959), it did apply to large loans made by institutional lenders.[54]
 As noted above, it is fair to say that the main thrust of the original 1913 legislation "was aimed at driving out the unlicensed makers of small loans charging an exorbitant rate," but long before 1962 it had been recognized that this was not the only effect of the 1913 loan shark law. When Mr. Brady testified that as late as 1930 it was considered that the entire Act applied only to small loans of $200 or less, he was drawing an inference from the Von Rosen case which our court refused to draw in Hartman v. Lubar[55] in 1942.
 There was never a dissent in any of the holdings of the eight cases discussed herein, the five older cases in which the issues turned about Sec. 605, or the three later cases in which the issues turned on Sec. 601 and Sec. 610. Before the petitions for rehearing, not one of the original parties in this case made any claim of any inconsistency of one prior decision with another.[56]
 The Mortgage Bankers Association, coming in as amicus curiae after our decision in the case at bar, now asserts that Hartman, Royall, and Indian Lake Estates are wrong, ought to be overruled, and that the earlier cases hold that the Loan Shark Act applied from the beginning only to small loans of $200 or less.[57] This is contrary to the Mortgage Bankers Association's testimony in 1962 urging an additional exemption for the insurance companies, at which time its representative recognized, that whatever its principal aim, by 1962 "this Loan Shark Law, despite the usury statute . . . prohibits the lending of money in the District at an interest rate greater than 6% unless the lender complies with the licensing and other provisions of that law,"[58] accepted the Hartman and Royall cases as controlling, and thought the proper method was to secure an additional exemption from Congress.
 The fact that the Mortgage Bankers Association in 1962 did not seek an exemption for its own members also implies that they considered themselves exempt, not because the Loan Shark Act did not apply to loans over $200, as they now contend, but because they believed that mortgage bankers were exempt as real estate brokers or agents. This is their other principal argument, to which we now turn.
 III. The Definition of Real Estate Broker
 A. The 1902 Trade License Tax Statute.
 We here recall the title of the 1913 Act: "To regulate the business of loaning money on security of any kind by persons, firms, and corporations other than national banks, licensed bankers, trust companies, savings banks, building and loan associations, and real-estate brokers in the District of Columbia." On the face of it, it verges on the incredible that Congress, after listing as exempt various types of "bankers," should have intended to exempt "mortgage bankers" by calling them "real estate brokers."[59]
 It was not "real estate brokers" as defined in the 1913 Act itself, or by the man in the street, or by an individual real estate broker, or by some judge in later years, which Congress exempted. Congress exempted "real estate brokers, as defined in the Act of Congress of July first, nineteen hundred and two." In our original opinion we analyzed that definition[60] at some length (pp. 173-174), to which we refer without repetition here. We concluded that all real estate broker activities, so defined, were "as agent for others," and that to reach a different conclusion would produce the most absurd and incongruous results.
 The Mortgage Bankers Association's brief (p. 14) unintentionally points up even more absurdities than we enumerated in our original opinion. "In our view the language requires the conclusion that the lending of the broker's own money subjects him to the real estate brokers license requirement." (Emphasis supplied.) If this is true, it would mean that any person or company, for example a bank, in the regular business of lending money on real estate would, under the MBA definition of "real estate brokers or agents," thereby become a real estate broker or agent, and be required to take out a real estate broker or agent license.
 It must be borne in mind that the 1913 Loan Shark Act and the 1902 Act defining and requiring the licensing of "real estate brokers and agents" are two separate statutes. Merely because a financial institution is listed in Sec. 610 as exempt from Sec. 601 of the 1913 Act has no bearing on whether its activities are those of a "real estate broker or agent" under the 1902 Act and thus require a license.
 Petitioners and amici curiae seem to approach the definition backwards. They assume that every type of business which may be carried on by one who also plies the traditional trade of a real estate broker falls within the statutory definition of "real estate broker." This would make the 1913 Act reference to "realestate brokers, as defined in the Act of Congress . . ." so unlimited as to be meaningless. The test of what activities constitute a real estate broker is very simple: if he engages in a certain activity, does this require him to pay the fee for a real estate broker's license and thereafter meet all statutory requirements as a real estate broker? If, from 1902 on, regularly lending one's own money on real estate security in itself required the lender to be licensed as a real estate broker or agent, then there must have been a large number of respected financial institutions which operated illegally as unlicensed real estate brokers.
 We reach the interesting conclusion, then, that if "real estate broker" in Sec. 610 and under the 1902 Act is defined as the Mortgage Bankers Association brief now urges, there was never any need to list as exempt in Sec. 610 all those other financial institutions at all-they were and are all "real estate brokers" by definition, and the "real estate broker" exemption covers them all.
 Of course, this is the ultimate absurdity, but it follows inexorably from the mortgage bankers' and petitioners' argument. The parties forget that the definition of real estate broker or agent was put into the statute in 1902 for the purpose of licensing persons engaging in that business, as part of a general revenue measure, before the exemption under Sec. 610 was passed in 1913 along with the rest of the Loan Shark Act. What a "real estate broker or agent" meant must be determined by Section 7, paragraph 15, of the Act of 1 July 1902, 32 Stat. 624; it is not to be found in the Loan Shark Act of 1913.
 The Act of 1 July 1902 is entitled "An Act Making appropriations to provide for the expenses of the government of the District of Columbia for the fiscal year ending June thirtieth, nineteen hundred and three, and for other purposes."[61] Section 7 is entitled "License Taxes" and in some forty-eight paragraphs enumerates different trades, businesses, and professions requiring a license and fixing a fee for the same.[62] Paragraph 15 imposes a license tax on real estate brokers or agents, and, in so doing, defines what are "real estate brokers or agents." It is this definition referred to in the Loan Shark Act of 1913, Sec. 10.
 The 1902 Act (H.R. 14,019) was primarily a revenue measure. Most of the debate centered around the proposed personal property tax on residents of the District, which had hitherto lacked one.[63] In addition to the desire to obtain more revenues through the imposition of a personal property tax, some members of the Congress evinced a feeling that some of the monied interests, a group which apparently included real estate brokers, were conspiring to keep the taxes on real property below what they might be.[64] Perhaps as a result of sentiments similar to these, and certainly as part of the effort to raise more revenue in the District, H.R. 14,019 was amended to include, among other additions, a provision which imposed a license tax on real estate brokers of fifty dollars per annum.[65]
 The provision for taxing real estate brokers, which was apparently introduced in the Senate, did not meet unanimous acclaim, however, and even in the House the brokers had their defenders:
 It is proposed to assess, if the bill follows the lines of the Senate bill, a license tax upon every broker in the City of Washington, few of whom, as I understand it, has received an income within a year that would amount to double the tax. The Senate bill goes on with iniquities. . . .[66]
 While the legislative history is not clear on this point, it would appear from the remarks of some Congressmen[67] that real estate brokers were being asked to pay a license tax for the first time by H.R. 14,019, although some other professions were subject to such a tax before 1902.
 With the legislative background in mind, we think it fair to draw the inference that the tax was intended to apply only to those who were engaging in what was then recognized as the profession of real estate brokers, that is, the acting as an agent for others in real estate transactions. We find it inconceivable that one who made loans out of his own funds, as was done by Walker & Dunlop in the case at bar, would have been thought of as such a real estate broker in 1902, and thus subject to the licensing tax for such activity. This being the definition and concept of "real estate broker" in 1902, this was what was incorporated in the Loan Shark Act of 1913.
 B. The 1932 Amendment to the 1902 Trade License Tax Statute
 This statute[68] is not cited by any of the parties, but to complete our analysis we discuss it briefly. Section 7 of the 1902 Act was amended to read as completely rewritten by this 1932 Act. The businesses, trades, or professions which required a license were relisted; "real estate brokers or agents" were not mentioned in this list.
 We think it unlikely that Congress intended to overturn the exemption for real estate brokers in the 1913 Loan Shark Act by this 1932 Licensing Act, which fails to mention them at all, but which is a complete replacement for Sec. 7 of the 1902 Act in which real estate brokers were defined.[69] We do not think this 1932 Act has any bearing on our conclusion in this case, and apparently neither do any of the parties, because it has never been cited. However it does appear that the omission of "real estate brokers" in the list of businesses required to be licensed by the 1932 Act provoked a situation in the District of Columbia which called forth the statute we next discuss.
 C. The 1937 "Act to Define, Regulate, and License Real Estate Brokers"
 Although the trustee had urged the point, we did not in our original opinion treat the definition of "real estate broker" actually in the D.C. Code at the date of the loan, 28 November 1960, since in our judgment the definition of the 1902 Act referred to in the 1913 Loan Shark Act clearly supported the decision reached, and the relation of the later definition of "real estate broker" to the Loan Shark Law is somewhat complicated to trace.
 However, the present and 1960 definition of "real estate broker" is illuminating. On 25 August 1937 the Congress passed "An Act to define, regulate, and license real estate brokers, business chance brokers, and real estate salesmen; to create a real estate commission in the District of Columbia; to protect the public against fraud in real estate transactions; and for other purposes."[70] Section 2 of the Act defines "real estate broker" exclusively in terms of one "who for another and for a fee, commission, or other valuable consideration" does various acts in regard to real estate. There is not a single action listed in the 1937 statute under the definition of "real estate broker" which is done for the broker himself; all are acts done as agents. Neither the State nor House Report commented on the definition of "real estate broker" to be found in the proposed bill, and neither made explicit reference to the Loan Shark Law.[71]
 Section 2 of the 1937 Act was amended in 1939 to add two activities carried on with one's own property and to classify them as those of a real estate broker. Today, as on the day of the transaction here before us, as 45 D.C. Code Sec. 1402, it reads:
 Sec. 45-1402 Definitions-Exceptions
 Whenever used in this chapter "realestate broker" means any person . . or corporation (foreign or domestic) who, for another and for a fee, commission, or other valuable consideration . . . [does a great variety of things re real estate of others] . . or who is engaged in the business of erecting houses . . . for sale on his . . . land . . . or who, as owner or otherwise and as a whole or partial vocation, sells, . . . offers or attempts to sell or to negotiate the sale of any lot or lots in any subdivision of land comprising ten lots or more: . . . . (Emphasis supplied.)
 Observe that all the multitudinous activities described as making one a "realestate broker" under the statute are to be done "for another and for a fee." Only if the person is engaged in the business of erecting houses for sale on his own land or selling a lot or lots in a subdivision comprising ten or more lots is the person acting not "for another and for a fee" considered a real estate broker. In all other instances the person must be acting "for another and for a fee" to be defined as a "real estate broker."
 Petitioner Hartford stated in its original brief, ". . . [A]t the time Walker & Dunlop made the loan to Suburban Motors, Inc., it held a valid District of Columbia real estate broker's license issued to it pursuant to D.C. Code Sec. 45-1401 et seq." (P. 3.) If Walker & Dunlop were licensed as real estate brokers, it had to be "pursuant to D.C. Code Sec. 45-1401 et seq.," because this was the only section of the Code under which Walker & Dunlop could have been so licensed. Section 18 of the 1937 Act repealed all laws or parts of laws in conflict therewith.[72] Unfortunately, this repealing clause was omitted from the D.C. Code in the 1951 and subsequent editions, but it was enacted. (This and another error in the Code make the relationship of the current real estate broker license law and the loan shark law complicated to trace, as noted above.)
 The other error in the Code is that in the current D.C. Code Sec. 26-610 "real estate brokers" are incorrectly referred to "as defined in sections 47-1701 to 47-1709," which is a hodgepodge of matters, nearly all of which are derived from the same 1902 Act which included as paragraph 15 the real estate broker definition, but which does not now contain paragraph 15 or anything else relating to real estate brokers.[73] "Real estate broker" is now defined, as it was on 28 November 1960, in D.C. Code Sec. 45-1402, the 1937 Act, and nowhere else. The Code itself, Sec. 45-1401, by cross referencing Sec. 26-610, indicates that the definition of real estate broker set forth in Sec. 45-1402 is the definition of real estate broker for the purpose of Sec. 26-610.[74] Under D.C. Code Sec. 45-1401 the 1937 Act is cross-referenced: "Exempted from operation of Money Lender License Law, see Sec. 26-610." The definition here of "real estate broker" is the definition now, and was on 28 November 1960.
 Whether the definition of Sec. 45-1402 is to be read as incorporated in Sec. 26-610 is less clear. While the reference runs from Sec. 45-1402 to Sec. 26-610, this is by way of annotation in the Code, and the cross-reference actually incorporated in Sec. 26-610 is erroneous and totally meaningless. The cross-reference in Sec. 26-610, as from the beginning with the 1913 Act, is no doubt intended to refer to the statutory definition of "real estate broker," and since 1937 the only statutory definition of "real estate broker" has been found in Sec. 45-1402.
 For the decision in this case, however, there is no problem presented. The definitions of the 1902 Act and the 1937 Act are consistent in defining a real estate broker as one who acts for another. To the extent there is any inconsistency or conflict-and we found none-we think the previous definition must yield to the definition of real estate broker in Sec. 45-1402.
 Walker & Dunlop simply loaned its own money on real estate security under Sec. 26-601; there has never yet been a claim that in this transaction Walker & Dunlop erected houses or sold lots in a subdivision, thus playing the only role of "real estate broker" under Sec. 45-1402 which involves the broker's own money or property. No petitioner for rehearing contends that Walker & Dunlop, Inc., acted as a "real estate broker" within Sec. 45-1402.
 IV. Applicability of District of Columbia or Maryland Law to the Three Transactions
 A. The previous decisions of the Referee, the District Court, and this Court
 
 
 [1]
 The Referee's Findings of Fact and Conclusions of Law
 One clarifying fact should be noted at the outset: the Equitable and Hartford did not originally make the loans involved in this case. The Equitable and the Hartford purchased the notes and took over the security on loans originally negotiated and made by business entities domiciled and principally operating in the District of Columbia; in contrast, the Manufacturers Life Insurance Company, a Canadian corporation, itself negotiated and made its loan here involved.
 All three ultimate holders of the notes and accompanying security-Equitable, Hartford, and Manufacturers-argued that Maryland law should apply to the three transactions. The Referee made three similar conclusions of law on other points applicable to all three parties below;[75] in regard to the question of which law applied, the Referee made no conclusion of law, although his fact-findings on the three transactions differed significantly on points relevant to this issue.
 
 
 [2]
 The District Court's action
 When Judge Gasch reviewed and approved the Referee's findings of fact and conclusions of law, in regard to the Manufacturers Life Insurance Company loan, he added a fourth conclusion of law, that Maryland law governed the transaction. He apparently did this on the basis of the Referee's different fact-findings re the Manufacturers-Pend-Maple, Inc., loan, as compared with the loans made originally by Walker & Dunlop to Suburban Motors, taken over by Hartford, and by Acacia Mutual to Potomac Cooperators, taken over by Equitable.
 
 
 [3]
 This Court's original opinion
 In our original opinion we concluded that the District Court was correct on the conflicts of laws question, Maryland law applied to Manufacturers, and District of Columbia law governed the Hartford and Equitable transactions.[76] In the original briefs this point was not argued strenuously by any party[77] except Manufacturers (which prevailed on it); hence we treated the claim principally under the Manufacturers loan, and referred to it comparatively briefly in our discussion of the Hartford transaction. Perhaps due to this bifurcated treatment of the applicable law question, none of the briefs on petition for rehearing even mentions the principal factors in our decision that Maryland law applied to the Manufacturers case but not to the Hartford and Equitable. Those factors were the specific findings of fact (p. 176) made by the Referee and specific conclusion of law (p. 170) made by the District Court in regard to Manufacturers, but not in regard to Hartford or Equitable, and the underlying differing circumstances of the three transactions supporting the fact-findings and conclusions of law.
 B. Factors Determining the Applicable Law
 As indicated in our original opinion (p. 172), in each of the three transactions we weighed and balanced the contacts with each jurisdiction (District of Columbia and Maryland) as grouped in the Restatement of the Law (Second), "Conflict of Laws," Sec. 188.[78] Those factors are:
 
 
 [1]
 The place of contracting
 
 
 [2]
 The place of negotiation of the contract
 
 
 [3]
 The place of performance
 
 
 [4]
 The location of the subject matter of the contract
 
 
 [5]
 The domicile, residence, nationality, place of incorporation, and place of business of the parties
 Section 188 of the Restatement also provides:
 (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in Secs. 189-199 and 203.C. Analysis of the Facts of the Three Transactions
 In contrast with our method of treatment in the original opinion, where we discussed and decided each claimant's case separately, here for clarity we bring together the facts of all three transactions relevant to the same question of which is the applicable law governing the transaction.
 
 
 [1]
 The Hartford transaction[79]
 
 
 *****
 
 * * *
 The place of negotiation of the contract[80] was the District of Columbia. Negotiations for the loan were initiated by letter of 31 August 1960, from Suburban Motors, Silver Spring, Maryland, to Walker & Dunlop, at their office address in Washington, D. C. (Cf. Finding of Fact 2.) Walker & Dunlop's President testified that the letter of commitment for the loan "was actually issued out of our District of Columbia office." In 1960 all its loans were made on its own account. In regard to this specific loan, "Walker & Dunlop made this loan for itself with its own money and settled on its own papers and subsequently sold the loan to Hartford Life." "It was acting as a principal." However, "the settlement of the loan took place in Montgomery County, Maryland" (FF 2).
 The place of performance,[81] both the lending and the repayment of the money, was the District of Columbia. "Walker & Dunlop itself advanced the money required to conclude the transaction" (FF 2). The Walker & Dunlop note,[82] executed by Suburban Motors before a notary public in Maryland, was dated at Washington, D. C., and specifically provided for payment "at the office of Walker & Dunlop, Inc., Washington, D. C., or at such other place as the holder hereof may from time to time designate in writing." The deed of trust quoted the language of the note. "On, or about, January 1, 1961, Suburban made its first installment payment under the terms of the note" (FF 1).
 The location of the subject matter of the contract[83] is both the District of Columbia and Maryland. The money was advanced by Walker & Dunlop, from its office in the District of Columbia, but the property on which the mortgage was given was real estate in Maryland.
 The lender, Walker & Dunlop, Inc., was a corporation with its principal office in the District of Columbia (FF 1), where it apparently carried on most of its business (FF 1 and 2). The borrower, Suburban Motors, Inc., was a Maryland corporation with its principal place of business there (FF 1).[84]
 
 
 [2]
 The Equitable transaction[85]
 
 
 *****
 
 * * *
 Without going into the same detail as in regard to the loan made by Walker & Dunlop and later taken over by Hartford, it is sufficient to point out that the original lender in the Equitable transaction was the Acacia Mutual Life Insurance Company, a company with its principal office in the District of Columbia; that the promissory note was dated in Washington, D. C., provided both "Principal and interest payable at the office of said Acacia Mutual Life Insurance Company, in Washington, D. C.," and was secured on real estate in Maryland. The note was dated 22 December 1959, and it was not until 22 March 1961 that the note was transferred to Equitable. Both the note and deed of trust were executed before a notary public of the District of Columbia by Potomac Cooperators. To the Equitable transaction an analysis similar to that made above in the case of Hartford applies.
 
 
 [3]
 The Manufacturers Life transaction[86]
 
 
 *****
 
 * * *
 The two notes were originally made payable "to the order of The Manufacturers Life Insurance Company, a Canadian corporation with its principal office in Toronto, Canada" (FF 1), and payable "in lawful money of the United States of America or its equivalent in New York exchange." The borrower was "Pend-Maple, Inc., a Maryland corporation with its principal office in the State of Maryland" (FF 1). "The proposal that Manufacturers make these loans to Pend-Maple, Inc., was submitted to Manufacturers by the H. G. Smithy Company, a mortgage loan correspondent and real estate establishment with its principal, and then only, office in the District of Columbia" (FF 2). Both the lender and the borrower were then domiciled and conducting their principal business outside the District of Columbia, although they were brought together by a District of Columbia company acting only in the role of broker.
 In regard to the place of negotiation of the contract, "Smithy did not negotiate the loan, nor was it authorized to do so. . . ., and most of its activities with respect to the loan took place in Maryland" (FF 5). "Although Smithy participated in the preliminaries leading to the conclusion of the transaction, and although legal advice, appraisals, and perhaps other professional assistance was furnished by attorneys, appraisers, and others maintaining offices in the District of Columbia, the loan was finally consummated in the State of Maryland (FF 3), and further, "the decision to make the loan was made by Manufacturers at its home office in Toronto, Canada. Manufacturers had no agent in the District of Columbia, at that time, authorized or empowered to make such loans (FF 2). Since "Smithy did not negotiate the loan" and the two principal parties were in Canada and Maryland, we think this indicates that the place of negotiation of the contract can properly be ascribed to Maryland; certainly it was outside of the District of Columbia.
 The place of contracting was Maryland, "the loan was finally consummated in the State of Maryland, where the notes and deeds of trust were executed and the deed of trust recorded" (FF 3).
 As to the place of performance, "subsequent to the consummation of the loan agreement, the monies involved were advanced over a relatively short period of time by Manufacturers from its office in Canada to Pend-Maple, Inc., at its office in Maryland, via the office of Smithy in the District of Columbia" (FF 4).
 And in further contrast, the Referee specifically found "the Manufacturers Life Insurance Company made no loans in the District of Columbia between January 1, 1959, and May 7, 1968, at a rate of interest in excess of 6% per annum," a finding which he did not make in regard to either Walker & Dunlop, Inc., or Acacia Mutual Life Insurance Company, who made the loans in the other two transactions.
 
 
 [4]
 Comparison of the Manufacturers loan with the Walker & Dunlop, Inc., and Acacia Mutual loans
 Weighing the criteria set forth in the Restatement and analyzing the findings of fact by the Referee in relation thereto, we think it fair to say that the Walker & Dunlop and the Acacia Mutual loans were loans negotiated in the District of Columbia, made with District of Columbia money, by business firms headquartered and regularly doing a loan business both in and out of the District of Columbia. These two original loans were specifically repayable in the District of Columbia.
 In contrast, the loan made originally by Manufacturers to Pend-Maple, Inc., was a loan by a Canadian corporation headquartered in Toronto, made with Canadian money, to a Maryland corporation outside the District of Columbia, and made by a foreign corporation which the Referee found as a fact over a period of years had never made a loan in the District of Columbia at more than 6%, and thus during that period had never been subject to the money-lending law here involved. Performance was to be in Toronto, Canada, with the notes payable in U. S. dollars or the New York exchange equivalent. The only contact with the District of Columbia was that the two principal parties were placed in contact with each other through the good offices of H. G. Smithy Company, which does operate in the District, and that the consummation of the loan was assisted in material respects by Smithy. But, again, the Referee found specifically that "H. G. Smithy Company did not negotiate the loan."
 Referring to subsection (3) of Section 188 of the Restatement, both the place of negotiating the loans and the place of performance were in the District of Columbia in the cases of Hartford and Equitable; in the case of Manufacturers, both negotiation and place of performance were largely, if not entirely, outside the District of Columbia. Where both negotiation and performance "are in the same state, the local law of this state will usually be applied. . . ."[87]
 Although analogies are sometimes treacherous, we think the borrowing (rental) of the monies involved in these three transactions might be analogized to the rental of automobiles. The role of Walker & Dunlop and Acacia Mutual is similar to the role of two auto rental agencies, regularly domiciled in the District and renting automobiles for use both in and out of the District. If Walker & Dunlop had rented a car (the money) from its office in the District of Columbia, delivered the car (the money) to the customer in Maryland, there secured the signature on the rental contract in Maryland, and instead of a deposit fee had taken as security the assignment on a small checking account in a Maryland bank, the rental of the car would not be dissimilar to the rental (borrowing) of the money here involved. In the case of the auto rental, it is clear that District of Columbia law could and should apply to the transaction, because this is the type of business activity in which the District of Columbia logically has an interest, and if anyone regulates it, the District of Columbia should. For example, the District might require both the business to be licensed, and the autos rented to bear D. C. license plates.
 On the other hand, if a business enterprise conducting operations in the District of Columbia, for example an airline, should arrange the delivery of a rental automobile, licensed in Canada, to a customer in Maryland, we doubt very much whether District of Columbia law should or does apply. The interest of the District of Columbia in regulating such a transaction is not apparent. And so here with the Canadian money arranged by Smithy to be loaned to the Maryland customer.
 The loans negotiated in the District, made with funds from the District and repayable in the District, by Walker & Dunlop and Acacia Mutual, both corporations domiciled and with their offices in the District, as the original lenders, are the type transactions which the District of Columbia does have a definite interest in regulating. From our analysis under Parts II and III above, it is clear that the Loan Shark Act of 1913 did cover this type transaction, and that law, as interpreted by our previous decisions, did govern these transactions in 1959-61. We therefore hold, as did the District Judge, that District of Columbia law governed the Walker & Dunlop-Hartford and Acacia Mutual-Equitable transactions, and that Maryland law governed the Manufacturers Life transaction. Whether District of Columbia law, specifically Sec. 26-601 et seq., today should continue to assert such interest and to regulate similar transactions is another question,[88] better resolved by a legislature than a court, to which we now turn.
 V. Epilogue
 Since the above was written, petitioner Hartford has filed a "Supplemental Petition," calling our attention to the "District of Columbia Consumer Protection Act of 1971,"[89] signed by the President 17 December 1971, which adds a Section 14 to the Loan Shark Act. This provides further exceptions to the coverage of Sec. 26-601, not by adding additional types of institutional lenders to the list of those exempted under Sec. 26-610, but by excepting certain categories of loans. Those excepted categories are "with respect to any loan":
 (1) to any corporation which is unable to plead any statutes against usury in any action;
 (2) at a rate of interest which does not exceed the maximum lawful rate of interest which would be applicable to such loan but for the provisions of this Act;
 (3) secured on real estate located outside the District of Columbia;
 (4) to a borrower residing, doing business, or incorporated outside the District of Columbia; or
 (5) greater than $10,000.
 The action taken by the Congress illustrates the correctness of what we said in Part I of this Opinion on Petition for Rehearing. The considered judgment of Congress in December 1971 as to what is best for the District of Columbia in the way of permissible interest rates on secured loans-when the interests of borrowers and lenders, large and small, in and out of the District, are all evaluated-has resulted in law which obviously would have been impossible for this court to write by reinterpreting existing law on the statute books and in our decided cases. Had we yielded to the arguments of counsel and held that indeed loans by insurance companies in 1959, 61 were somehow exempt under Sec. 26-610 (although for some reason Congress in 1963 found it necessary to amend Sec. 610 to include insurance companies), and also held that "real estate brokers, as defined" did indeed include mortgage bankers, we would have in effect rewritten the Loan Shark Act in a way quite different from what Congress chose to do-and we would have done so not necessarily in the wisest fashion.
 By way of illustration, at one point in its legislative development S. 1938 took care of the recognized problem of large real estate loans made by mortgage bankers by simply adding "mortgage bankers and other institutional lenders engaged in making loans secured by real estate" to the list of those exempt under Sec. 610.[90] This raised precisely the same objections that had been raised in 1912 to the proposed amendment to exempt all real estate secured transactions,[91] i. e., if second or third mortgages for comparatively small amounts are involved, these do generate a high rate of interest, and there is some public interest in regulating these, no matter by whom made. Hence S. 1938 was changed to except certain categories of loans, one of the exceptions being those "greater than $10,000." This has the effect of leaving within the restriction of Sec. 26-601 smaller second or third mortgage loans which might carry a high rate of interest,[92] unless otherwise excepted by Sec. 26-610 or the new Section 14.
 In addition to adding Section 14 amending the Loan Shark Act, there is also in the new Consumer Protection Act (Section 9(b)) a proviso which excepts from the application of the new Section 14 any loan "concerning which an action under [the Loan Shark Law] has been filed in a court of competent jurisdiction on or before November 10, 1971." The last-mentioned date is the date on which the original opinion of this court herein was issued, and therefore the new Act's provisions do not apply to the litigants in the case at bar. In its "Supplemental Petition" Hartford argues that "for Congress to cure retroactively all loans falling within the language of the new Section 14(a) of the Loan Shark Act with the exception of those under judicial consideration on or before November 10, 1971 is a violation of [Hartford's] rights of due process of law and equal protection of the law."[93] We find no merit in this contention, and it thus has no effect on our disposition of this case.
 First, it is well settled that a curative statute, such as the new Section 14 of the Loan Shark Law, may not be operative as to pending litigation where the legislature has so indicated by express provision.[94] Second, we have not been cited to any authority, nor can we find any, which holds that an exception for pending litigation in a curative act is an unconstitutional deprivation of due process or equal protection of the laws. Third, and last, in order for Section 14 to be applied to Hartford, Congress would have had to overrule expressly the determination of this court and of our District Court as to the particular litigants in this case. Such action on the part of Congress would have raised a serious question of usurpation of judicial power, a possible fundamental violation of the integrity of our constitutional system with separate powers in its three coordinate and co-equal branches.[95] This issue Congress obviously and properly tried to avoid by respecting the judicial determination already made, and thus Section 14 was written expressly to exclude litigants such as Hartford. While we have here no need to pass on the constitutionality of the new Section 14 in its application, we can find nothing wrong with the proviso which excludes pending suits.
 The petitions for rehearing and briefs amici curiae have been considered by the entire Court, which has conferred upon this case. The majority of the entire Court believed that because of the time factor alleged to be of importance and the prospective action of Congress (which has materialized), the public interest would be better served by reconsideration by the original panel rather than assuming the delay necessary for oral argument en banc. We are authorized to state that a majority of the entire Court agree with the decisions of the panel in this case.
 For the reasons given above, the petitions for rehearing filed by intervenor Adams Properties, Inc., appellee Equitable Life Insurance Co., and appellee Hartford Life Insurance Co. are
 Denied.
 VAN PELT, Senior District Judge (dissenting):
 I find it necessary to use again the opening words of my previous dissent to the effect that it is with reluctance that I conclude that I cannot concur in the well-written supplemental opinion of Judge Wilkey, concurred in by Chief Judge Bazelon, on the petition for rehearing.
 Again a lengthy dissent is unnecessary. Detailed comment on the various briefs filed on the question of reconsideration or rehearing and en banc hearing and the various amicus curiae offerings is unnecessary. I do feel that my views as to Restatement (Second) could be helpful.
 My continued dissent is not with intent to emphasize the "intolerable situation" which, according to a congressional report on the proposed amendments to the District of Columbia Consumer Protection Act of 1971, the previous decision is said to have created. The action I propose will, however, lessen the outside pressures, if any. Because I feel that the Manufacturers and Hartford claims are based upon Maryland contracts, and thus valid under Maryland law, I suggest that we withdraw all parts of the previous opinions discussing the interpretation and applicability of the Loan Shark Act and decide that issue only in event it is later presented and is necessary to be decided in an appeal involving the Equitable note and deed of trust. I am not disagreeing with the return of the Equitable claim for the taking of further evidence.
 In fairness, I should admit my agreement with the language of the House of Representatives' report on the above described 1971 Act in which, after referring to Von Rosen v. Dean, 59 App.D.C. 359, 41 F.2d 982 (1930),[1] it was stated: "In the intervening years since the 1920 [sic] case, court decisions have gradually altered the interpretation of the law . . . ." I was of opinion when my previous dissent was written that Von Rosen v. Dean, supra, was a correct interpretation of the Loan Shark Act and that Congress, when it passed the Loan Shark Act, did not have in mind transactions such as were involved in the Von Rosen case, or in these cases. At the time it seemed inappropriate for me as a visiting judge to suggest the overruling of Hartman v. Lubar, 77 U.S.App.D.C. 95, 133 F.2d 44 (1942) and subsequent cases which I regard as altering Von Rosen. I do feel that a convincing argument can be made that Hartman and these other cases were wrongly decided. I think, however, that such an important issue should be the subject of an en banc hearing if later it is necessary to pass on the Loan Shark Act.
 All three of us are in agreement as to Manufacturers' claim. In the majority opinion it is stated:
 "Here we have a real estate transaction, involving a note, a security instrument, and a sizeable sum of money, challenged as to its validity because of a moneylending regulatory statute in the District of Columbia, where some of the activities in connection with the loan unquestionably took place. At best, the Trustee can create a conflict between Maryland and District of Columbia law and a choice as to which might govern; where there is a choice of jurisdictions, the preferable course is to select the law of the jurisdiction which would sustain the transaction, and here this is Maryland. This rule contributes to the certainty of commercial transactions, one of the prime objects of all commercial law." p. 171, footnote omitted.
 I am in agreement with this statement. I quote it here to emphasize the language that the preferable course is to select the law of the jurisdiction which would sustain the transaction.
 In the supplemental opinion, the majority rely upon the American Law Institute's Restatement of the Law (Second) "Conflict of Laws" Sec. 188, setting forth five factors to be weighed and balanced. They are:
 1) The place of contracting.
 All briefs seem in agreement that the note and deed of trust were executed in Maryland. The supplemental opinion states: ". . . however, 'the settlement of the loan took place in Montgomery County, Maryland' (FF 2)." It is clear to me that this factor weighs in favor of applying Maryland law.
 2) The place of negotiation of the contract.
 Here we have a loan negotiated by correspondence. One party was in Maryland; the other in the District of Columbia. The papers were signed in Maryland. Since the actual signing culminates the negotiations and anything in the writings to the contrary of the signed instruments would be ineffective, barring fraud, and in some instances clear mistake, I feel that it is just as fair to say that the contract was negotiated in Maryland as to say, as the majority indicate, that it was negotiated in the District of Columbia. If the preferable course is to select the law of the jurisdiction which would sustain the transaction, then this factor should be balanced in favor of Maryland.
 3) The place of performance.
 If by place of performance is meant the place where the periodic repayments of the loan are to be made, then it is the District of Columbia. If by place of performance is meant where the loan proceeds were paid then it is Maryland. Since the money was paid in Maryland, I conclude that the place of performance is Maryland.
 4) The location of the subject matter of the contract.
 The subject matter of the contract was the real estate. It was located in Maryland. I am in complete disagreement with the supplemental opinion taking the position that the location of the subject matter of the contract is both in the District of Columbia and in Maryland. To me the facts clearly support a finding that this factor supports a determination that Maryland law applies.
 5) The domicile, residence, nationality, place of incorporation and place of business of the parties.
 So far as the borrower is concerned, all of these factors are answered by saying Maryland. As to Walker & Dunlop the factors are to be answered District of Columbia except as to place of incorporation. One of the briefs would indicate that Walker & Dunlop were incorporated in Delaware. If this is correct, then there are four District of Columbia answers and six non-District of Columbia answers. Even if Walker & Dunlop are incorporated in the District of Columbia, this factor is evenly divided and if we apply "the preferable course" doctrine, which we all agree should be applied to Manufacturers, then as to this factor we should determine that it is a Maryland contract.
 Thus, I feel that a proper weighing and balancing of the Section 188 contacts supports the conclusion of my original dissent that the Hartford claim is based upon a Maryland contract and that Maryland law should apply.
 Section 188 is not the only section of "Conflict of Laws" Restatement (Second) to which our attention must be given. Section 6 of the Restatement (Second) gives the general "Choice-of-Law Principles" which are referred to in Section 188. Section 6 provides:
 "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.[2]
 "(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied."
 While under the majority's rationale "the relevant policies of the forum" could call for application of the Loan Shark Act, although they do not compel it, "the relevant policies of other interested states" (in this case the State of Maryland), "the protection of justified expectations," "the basic policies underlying the particular field of law," "certainty, predictability and uniformity of result, and "ease in the determination and application of the law to be applied," all call for application of Maryland law. It is clear to me, as I have above attempted to point out, that Maryland does have the more significant contacts under Section 188 and when Section 188 is read with Section 6 it is even clearer that Maryland law should be applied.
 This is not the first time that a conflict of laws question has arisen. Throughout the history of such conflict questions, the law of the place where the property is situated has received great emphasis. It may be a fair statement to say that it has received the greatest emphasis of any factor. See, e. g., United States v. Crosby, 11 U.S. (7 Cranch) 115, 3 L.Ed. 287 (1812); Restatement of the Law, "Conflict of Laws" Secs. 214-54 (1934).
 In addition, the situs of real property is given overriding consideration by the Restatement (Second) in Sec. 228 which applies to such questions as whether a mortgage creates an interest in land and the nature of the interest created. However, the rules for determining which law governs the validity of the underlying debt are those in Chapter 8 dealing with contracts.
 In considering Restatement (Second), Sec. 195 is not to be overlooked. It reads:
 "The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the transaction and the parties, in which event the local law of the other state will be applied."
 In the Section comment, we read:
 "c. When local law of place of repayment will not be applied. On occasion, a state which is not the place where the contract requires that the loan be repaid will nevertheless, with respect to the particular issue, be the state of most significant relationship to the transaction and the parties and hence the state of the applicable law. This may be so, for example, when the contract would be invalid under the local law of the state where repayment is to be made but valid under the local law of another state with a close relation to the transaction and the parties. In such a situation, the local law of the other state should be applied unless the value of protecting the expectations of the parties by upholding the contract is outweighed in the particular case by the interest of the state where the loan is to be repaid in having its invalidating rule applied. There will also be occasions when the local law of some state other than that where the loan is to be repaid should be applied in any event because of the intensity of the interest of that state in having its local law applied to determine the particular issue (see Illustration 1)." (Emphasis supplied.)
 To me it is clear that Maryland not only has the "more significant relationship" to the transaction but it also seems under the majority's view, as expressed in disposing of the Manufacturers' claim, that if the contract would be invalid under District of Columbia law but valid under the Maryland law, Maryland law should be applied.
 While the Loan Shark Act is not, as I suggested in my original dissent, a usury statute, the general reasoning of Restatement (Second) Sec. 203 is not to be overlooked as we discuss the Restatement principles applicable to this case.
 "The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of Sec. 188."
 Change the words "charge of usury" to whatever words attorneys for the Trustee care to use in arguing for invalidity of the Hartford instruments, and this sentence becomes a concise, fair affirmance of the Hartford transaction.
 We are all in agreement that the Equitable case should be remanded to the District Court, which in turn, under my understanding of the law applicable to bankruptcy reviews, would return the case to the Referee in Bankruptcy for the introduction of further evidence. The Referee may well find that there has been a novation or that Maryland law applies or that the Loan Shark Act, even as interpreted by the majority in the opinion which I suggest withdrawing, does not apply to the transaction. If Maryland law applies or there has been a novation, there will be no occasion for the Referee or reviewing courts to pass on the Loan Shark Act.
 If it later becomes necessary, I suggest, in view of the recent action of the 92nd Congress in this field, that another panel or the court en banc might well take another look at the congressional intent of the original Act before it concludes as the majority here have, in effect, that Von Rosen v. Dean, supra, was incorrectly decided.
 For these reasons I dissent from the majority's original opinion and supplemental opinion. I propose the withdrawal of all comment in both opinions as to the applicability of the Loan Shark Act, the affirmance of the Manufacturers and Hartford cases on the basis of Maryland law, and the return of the Equitable claim to the District Court and through that court to the Referee in Bankruptcy for the taking of further evidence, after which the Referee can then enter an order which will become subject to the usual review procedures.
 I have had an opportunity to read the opinion of Judge MacKinnon and I add my concurrence.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 ORDER
 PER CURIAM.
 On consideration of the suggestions for rehearing en banc, and of the responsive pleadings filed with respect thereto, and there not being a majority of the judges in regular active service in favor of having these cases reheard en banc, it is
 Ordered by the Court en banc that the aforesaid suggestions are hereby denied.
 Circuit Judges TAMM, MacKINNON and ROBB would grant rehearing en banc.
 MacKINNON, Circuit Judge:
 Concisely stated, the panel opinion holds that it was the intent of Congress in the Loan Shark Act to prohibit all lenders (except banks, etc.) from making non-usurious loans over $200 unless the lender was licensed under a law that prohibits licensees from making any loan over $200. Such opinion thus produces the absurd result of penalizing a lender for making certain loans without a license which loans would still be prohibited even if the lender were licensed.[1]
 In my opinion the case should have been heard by the court sitting en banc because the validity of subject transactions "involves a question of exceptional importance" and, since the panel decision failed to ascertain the true legislative intent, rehearing en banc is necessary in order to secure uniformity of our decisions. Fed.R.App.P. 35(a).
 My major objections to the panel opinion are twofold. First, it applies the Loan Shark Law to non-usurious lenders, contrary to the basic intent of the statute, and, secondly, it imposes a penalty, complete confiscation of the loan, that is not authorized by the statute. At the outset it must be recognized that all these loans were made at rates of interest, 6 1/4 and 6 1/2% per annum, which were legal under the 8% usury rate fixed by statute in the District of Columbia.
 The cardinal error of the panel opinion is that it fails to recognize that Congress in the Loan Shark Act was only regulating usurious lenders. Its failure in this respect is caused by a disjunctive and overly literal reading of the words "six per cent" in Sec. 601. It reads these words without comprehending the basic intent of Congress in 1913. All the panel opinion sees is the three letters "s-i-x". Actually, what Congress was referring to was the then existing general usury rate which at that time was 6% per annum. Thus when Congress required the licensing of persons who charged interest in excess of 6% per annum what they were really requiring in 1913 was the licensing of usurious lenders; and when Congress changed the usury rate to 8% per annum in 1920 it is to be considered as impliedly amending the 6% rate in the Loan Shark Act to conform to the 8% change in the usury rate. Millard v. Harris, 132 U.S. App.D.C. 146, 153, 406 F.2d 964, 971 (1968)[2]; Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 250, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); American Tobacco Co. v. Werckmeister, 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208 (1907); Holy Trinity Church v. United States, 143 U.S. 457, 461, 12 S.Ct. 511, 36 L.Ed. 226 (1892). There was never any intent to require legitimate lenders to be licensed-only usurious lenders. The three principal cases upon which the panel opinion relies all involved usurious loans.[3] The licensing requirements of the Loan Shark Act when it was enacted did not require the licensing of one legitimate lender. No legitimate lender charged usury. And yet, without any change in the Loan Shark Act, the panel opinion now construes these same provisions to require the licensing of all legitimate lenders except banks, etc.
 The panel opinion also fails to recognize that Congress in 1913, when it provided that the Loan Shark Act would not apply to banks, etc., was not exempting banks from the requirements of the law but was excluding banks from the right to be licensed under the act to make small loans at rates up to 1% per month.
 The opinion also fails to recognize the common sense of the situation. Thus, when Congress in 1920 raised the usury rate from 6% to 8% and provided that such action should not "repeal or affect" the Loan Shark Act, the real intent of Congress was to assure that its fixing of the usury rate at 8%, which was below the maximum authorized for small loan companies, would not, by virtue of being a later enactment, be held to repeal the right conferred by the Loan Shark Act on small loan companies to charge up to 1% a month on loans up to $200 and not to thereby backhandledly convert the licensing provisions of the Loan Shark Act so as to require the licensing of all otherwise legitimate lenders, except banks. An analysis of all the applicable statutes and the legislative history makes it clear that Congress never had any such intent. That is in effect what Congress said in 1960 in the Committee Report which stated that the Loan Shark Act "obviously" did not apply to loans made by Small Business Investment Companies but that it was enacting the amendment adding SBIC's to the list of exempted institutions to make sure that a literal interpretation was not applied to such companies. Why our court in 1971 would ignore this statement by Congress that it "obviously" did not intend the interpretation of the law that the opinion now asserts, is hard to understand.
 Congress again said essentially the same thing on December 17, 1971 when it passed a curative act validating practically all large loans made in the District of Columbia since the Loan Shark Act was enacted in 1913. This massive curative act stated in effect that no provision of the Loan Shark Act shall apply to any loan (those in litigation excepted) made at a rate of interest which did not exceed the maximum lawful rate of interest which would be applicable to such loan but for the provisions of the Loan Shark Act. When that statute is read and understood that is precisely what Congress said in 1913 in the Loan Shark Act and the provision to that effect (Sec. 601) has never been amended.
 I also concur in the dissenting opinion of Judge Van Pelt, and particularly as to the status of those loans made by real estate brokers. (See his discussion of the claim by Hartford Life Insurance Company.) The real estate broker argument is controlled by the language of the 1902 statute which recognizes that real estate brokers make loans for their own account. It is evident from the statute that when Congress inserted the words "for others" as a qualification to the last clause that it thereby indicated that the initial requirement "as agent for others" would not apply beyond the first clause, i. e., those who sold or offered for sale. In any event this is the normal effect of a qualifying phrase which the court's opinion recognizes when it states that the words "as agent for others" is dreadfully misplaced. It is dreadfully misplaced if one seeks to have it amend subsequent clauses but not if it is applied to the next precedent clause which is the normal intent and meaning. The general rule is that relative and qualifying words, phrases and clauses are to be applied to the words or phrase immediately preceding and not to others more remote. United States ex rel. Santarelli v. Hughes, 116 F.2d 613, 616 (3d Cir. 1940); Mandel Bros., Inc. v. Federal Trade Commission, 254 F.2d 18, 22 (7th Cir. 1958); T. I. McCormack Trucking Co. v. United States, 251 F.Supp. 526, 532-533 (D.N.J.1966); 82 C.J.S. Statutes Sec. 334, p. 670.
 For the foregoing reasons I vote to hear the case en banc. Judges TAMM and ROBB also concur in this opinion.
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1964)
 
 
 [1]
 D.C.Code, Title 26, Sec. 26-601 et seq. (1967)
 
 
 [2]
 Section 70(c), 11 U.S.C. Sec. 110(c) provides:
 (c) The trustee may have the benefit of all defenses available to the bankrupt as against third persons, including statutes of limitation, statutes of frauds, usury, and other personal defenses; and a waiver of any such defense by the bankrupt after bankruptcy shall not bind the trustee. The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists.
 
 
 [3]
 In re Waynesboro Motor Co., 60 F.2d 668, 669 (S.D.Miss.1932)
 
 
 [4]
 4A Collier on Bankruptcy, p 70.45, at 558-59
 
 
 [5]
 D.C.Code Secs. 45-501, 45-601, 15-102; Hitz v. National Metropolitan Bank, 111 U.S. 722, 728, 4 S.Ct. 613, 28 L.Ed. 577 (1884); Admiral Co. v. Thomas, 106 U.S.App.D.C. 266, 271 F.2d 849 (1959); Osin v. Johnson, 100 U.S.App.D.C. 230, 243 F.2d 653 (1957); Munsey Trust Co. v. Alexander, Inc., 59 App.D.C. 369, 42 F.2d 604 (1930); Atlas Portland Cement Co. v. Fox, 49 App.D.C. 292, 265 F. 444 (1920); Ohio Nat'l Bank v. Berlin, 26 App.D.C. 218, 227 (1905)
 
 
 [6]
 Section 70(e) (1), 11 U.S.C. Sec. 110(e) (1) provides:
 (e) (1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor.
 
 
 [7]
 11 U.S.C. Sec. 75(a) (8)
 
 
 [8]
 See generally 4A Collier on Bankruptcy p 70.04 et seq., at 48ff. (14th ed. 1969). As was said in the case of Cartwright v. West, 173 Ala. 198, 55 So. 917, 918 (1911):
 The trustee in bankruptcy in a sense is representative of both the bankrupt and the creditors. As such he succeeds in right and title to the bankrupt's estate for the benefit of his creditors. He may, as a general rule, maintain all actions, both at law and in equity, for the recovery and preservation of the assets, both real and personal, of the bankrupt's estate that the bankrupt himself, but for the bankruptcy, could have maintained. Even more, he may maintain an action the bankrupt could not, where, as in the present case, he seeks to avoid conveyances made by the bankrupt in fraud of his creditors. In this latter instance it cannot be said that the trustee is a representative of the bankrupt, for he [the bankrupt] could not maintain such a bill, nor in any legal or equitable proceeding become a beneficiary of his own fraudulent act. * * * The bill before us is in the nature of a creditor's bill to set aside fraudulent conveyances made by the debtor, and the trustee in filing it in reality represents the interests of the creditors alone. The object of a recovery is for distribution among the creditors of the bankrupt. (Emphasis supplied.)
 In the case at bar, of course, we are not dealing with fraudulent conveyances, but in setting aside any voidable preferences or void security the role of the trustee is equally to act for the benefit of all creditors. We cannot, therefore, agree with our dissenting colleague, whose reluctance to apply the statute to the case of Hartford here stems in part from a belief-mistaken, we think-that somehow to do so would result "in a windfall to the Bankrupt."
 
 
 [9]
 Hartman v. Lubar, 77 U.S.App.D.C. 95, 97, 133 F.2d 44, 46 (1942), cert. denied, 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943)
 
 
 [10]
 Appellees' reliance on District of Columbia v. Brady, 109 U.S.App.D.C. 324, 288 F.2d 108 (1960), is misplaced. Brady held that a practicing physician who, through a real estate broker, regularly invested his earnings in first trusts on real estate was not in the business of loaning money for the purpose of payment of District of Columbia unincorporated business franchise taxes, D.C.Code Sec. 47-1574 (1967), and did not refer to the entirely different question of whether Dr. Brady was subject to the provisions of the Loan Shark Act. The regulations promulgated under authority of the statute by the Commissioners of the District of Columbia define "engaged in the business of loaning money" as "the holding out in the District of Columbia, by the maintenance of a place of business in the District of Columbia, or in any other manner, that a loan or loans of money may be effected by or through the person so holding out, plus the performance in the District of Columbia by such person of one or more acts which result in the making or in the collection of a loan of money."
 
 
 [11]
 Small business investment companies and life insurance companies were added to the list of exempted businesses in 1960 and 1963, respectively. The language of the 1963 exemption for life insurance companies in no way indicates that it is intended to have retrospective application. It is thus of prospective operation only. See Restatement, Contracts, Sec. 609. The original loans here in question were all made prior to 1963
 
 
 [12]
 Appellees argue that Sec. 35-105 and Sec. 47-1806 of the D.C.Code relieve life insurance companies from compliance with other licensing statutes. These sections, however, simply provide that insurance companies will be taxed on a certain basis in lieu of all other taxes. However, the fee required to be paid by non-exempt lenders who make loans at an interest rate in excess of six percent is clearly not a tax but rather a licensing fee, and this court has so held. Indian Lakes Estates, Inc. v. Ten Individual Defendants, 121 U.S.App.D.C. 305, 311, 350 F.2d 435, 441 (1965). Furthermore, it is obvious that if the provisions of Secs. 35-105 and 47-1806 exempting life insurance companies from payment of "other taxes" were intended to exempt them from license fees such as that prescribed by Sec. 26-601, there would have been no reason for Congress in 1963 to amend Sec. 26-610 expressly to provide exemption of life insurance companies from the Loan Shark Act
 
 
 [13]
 United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); Cities of Statesville v. AEC, 142 U.S. App.D.C. 272, 284, 441 F.2d 962, 974 (1969)
 
 
 [14]
 Indian Lakes Estates, Inc. v. Ten Individual Defendants, 121 U.S.App.D.C. 305, 350 F.2d 435 (1965); Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F.2d 577 (1959)
 
 
 [15]
 77 U.S.App.D.C. 95, 96, 133 F.2d 44, 45 (1942)
 
 
 [16]
 Section 609 of the Restatement of the Law, Contracts, states the applicable general principle as follows:
 A bargain that is illegal when formed does not become legal . . .
 (b) by reason of a change of law, except where the legislature manifests an intention to validate the bargain.
 The comment to Sec. 609 provides the following pertinent example:
 (2) A borrows money from B, promising to pay at a rate of interest forbidden by law. Later, but before the time for performing the bargain, a statute is passed allowing such interest. Unless a purpose is manifested in the statute to validate existing bargains, the bargain remains illegal. (Emphasis added.)
 
 
 [17]
 H.R.Rep.No.1608, 86th Cong., 2d Sess. 8 (1960)
 
 
 [18]
 Hearings on H.R. 9441 (87th Cong.) before Subcommittee No. 2 of the House District of Columbia Committee 1 May 1962 (unpublished transcript on file at U. S. Archives), page 3. H.R. 9441 was not enacted, but was reintroduced in the 88th Congress as H.R. 3191, and was enacted 5 December 1963 as P.L. 88-191, thus finally conferring on the insurance companies an exemption from the licensing requirements of Sec. 26-601 by adding insurance companies to the list of those exempted under Sec. 26-610
 
 
 [19]
 Ibid
 
 
 [20]
 Hartman v. Lubar, footnote 9, supra
 
 
 [21]
 S.Rep.No.650, 88th Cong., 1st Sess. 1, (1963)
 
 
 [22]
 E. g., Bowen v. Mount Vernon Savings Bank, 70 U.S.App.D.C. 273, 105 F.2d 796 (1939); In re Feldman, 259 F.Supp. 218, 222 (D.Conn.1966)
 
 
 [23]
 "[I]f a lawful performance has been rendered beneficial to the receiver of it, and if the evil and illegal elements and purposes can be abandoned and rendered harmless to society, a promise by the benefited party to pay reasonable compensation for the beneficial performance will be enforceable. It is the executed performance and the moral obligation that will support it." IA Corbin, Contracts, Sec. 236, at 371 (1962)
 
 
 [24]
 It would seem that it is the intent of the parties at the time of Equitable's purchase of the note that is material. It appears that the note was not actually amended until 28 August 1961, some five months after the note was purchased by Equitable. If, during this period, Potomac continued to pay interest at a rate of 6 1/4% it might indicate that at the time of purchase there was no intent that Equitable receive no more than 6% interest of the remainder of the loan. In that event, Equitable, having itself received illegal interest would then be in no position to escape the sanctions of the Loan Shark Law, unless the payment of excess interest during this period is found to have been inadvertent or de minimis, and not in accordance with the intent of the parties. Cf., Restatement, Contracts, Secs. 537, 600
 
 
 [25]
 Commissioners of the District of Columbia, Regulations for the Conduct of the Business of Loaning Money, 6 Sept. 1949
 
 
 [26]
 Keco Industries, Inc. v. ACF Industries, Inc., 316 F.2d 513, 514 (4th Cir. 1963) (emphasis supplied)
 
 
 [27]
 Kossick v. United Fruit Co., 365 U.S. 731, 741, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Pritchard v. Norton, 106 U.S. 124, 1 S. Ct. 102, 27 L.Ed. 104 (1882); Teas v. Kimball, 257 F.2d 817 (5th Cir. 1958); Heede, Inc. v. West India Machinery & Supply Co., 272 F.Supp. 236 (S.D.N.Y.1967); Bernkrant v. Fowler, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961); Cochran v. Ellsworth, 126 Cal.App.2d 429, 272 P.2d 904, 909 (1954); Green v. Northwestern Trust Co., 128 Minn. 30, 150 N.W. 29 (1914). Compare, Restatement (second) Conflict of Laws, Sec. 202 and Sec. 203 (1971) and comments thereto
 
 
 [28]
 Section 188(2) of the Restatement provides:
 (2) In the absence of an effective choice of law by the parties (see Sec. 187), the contacts to be taken into account in applying the principles of Sec. 6 to determine the law applicable to an issue include:
 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 Although payment of the loans here involved are evidently made in the District of Columbia, through the Smithy Co., we think that notwithstanding the rule set forth in Sec. 195 of the Restatement that the law of the jurisdiction where repayment is to be made ordinarily controls the validity of contracts for the repayment of money, in the instant case the rationale of Comment c to Sec. 195 should prevail. Comment c suggests that "when the contract would be invalid under the local law of the state where repayment is to be made but valid under the local law of another state with a close relation to the transaction and the parties," the law of the latter state, Maryland in the instant case, should control.
 
 
 [29]
 Brenner v. Plitt, 182 Md. 348, 34 A.2d 853, 858-859 (1943); Carozza v. Federal Finance & Credit Co., 149 Md. 223, 246-247, 131 A. 332, 341 (1925)
 
 
 [30]
 With slight changes this has been carried in succeeding statutes and is found in the Real Estate Brokers Act of 1937, D.C.Code Sec. 45-1401 et seq. (1967)
 
 
 [31]
 Blow v. Ammerman, 121 U.S.App.D.C. 351, 350 F.2d 729 (1965); Northside Bank of Tampa v. Investors Acceptance Corp., 278 F.Supp. 191 (W.D.Pa.1968)
 
 
 [32]
 This burden was placed on Hartford by both the Negotiable Instruments Law which was in effect at the time Hartford purchased the note, D.C.Code Sec. 28-409 (1961 ed.) and the Uniform Commercial Code which was subsequently adopted. D.C.Code Sec. 28:3-307(3) (1967)
 
 
 [33]
 This section applies even though Hartford's purchase of the instruments involved occurred prior to the enactment of it. United Securities Corp. v. Bruton, 213 A.2d 892 (D.C.App.1965)
 
 
 [34]
 D.C.Code Sec. 28-402 (1961), superseded by D.C.Code Sec. 28:3-302(1) (c) (1967)
 
 
 [35]
 D.C.Code Sec. 28-102 et seq. (1961 ed.)
 
 
 [36]
 Royall v. Yudelevit, 106 U.S.App.D.C. 1, 3, 268 F.2d 577, 579 (1959)
 
 
 [37]
 The referee's allowance of the Hartford claim was predicated on the notion (which we find erroneous) that the Loan Shark Law was not applicable in this situation. The entire memorandum of the referee is written under the premise that District of Columbia law governs, however. See Appendix, pages 41-49
 
 
 [38]
 Referee's Finding of Fact No. 2. (Manufacturers)
 
 
 [39]
 Referee's Finding of Fact No. 7. (Manufacturers)
 
 
 [40]
 Referee's Finding of Fact No. 1. (Hartford)
 
 
 [41]
 E. g., the referee stated in regard to Manufacturers, "the loan was finally consummated in the State of Maryland" (F.F. 3) and similarly re Hartford "the settlement of the loan took place in Montgomery County, Maryland" (F.F. 2)
 
 
 *
 Since the panel decision, briefs on the question of reconsideration and en banc hearing have been filed by intervenor Adams Properties, Inc. (Successor in interest to Parkwood), appellee Equitable Life Insurance Company, and appellee Hartford Life Insurance Company. Briefs amici curiae have been filed by Attorney Hershel Shanks, by the Mortgage Bankers Association of Metropolitan Washington, Inc., and by Acacia Mutual Life Insurance Company. In this opinion, reference to "petitioners" includes Equitable, Hartford and the amici curiae supporting their position, unless the context otherwise indicates
 
 
 [1]
 D.C.Code, Sec. 26-601 et seq. (all references to the District of Columbia Code are to the 1967 edition, unless otherwise specified)
 
 
 [2]
 D.C.Code Sec. 26-610
 
 
 [3]
 Act of February 4, 1913, 37 Stat. 660; Act of June 11, 1960, 74 Stat. 196, Pub.L. 86-502; and Act of December 5, 1963, 77 Stat. 344, Pub.L. 88-191
 
 
 [4]
 See Brief For the Mortgage Bankers Association of Metropolitan Washington, Inc., As Amicus Curiae, at 9ff (hereafter "Mortgage Bankers Brief")
 
 
 [5]
 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)
 
 
 [6]
 381 U.S., at 622-628, 85 S.Ct., at 1737
 
 
 [7]
 Hartman v. Lubar, 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), cert. denied, 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943); Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F.2d 577 (1959); and Indian Lake Estates, Inc. v. Ten Individual Defendants, 121 U.S.App.D.C. 305, 350 F.2d 435 (1965)
 
 
 [8]
 Note 7, supra
 
 
 [9]
 Note 7, supra
 
 
 [10]
 Note 7, supra
 
 
 [11]
 Act of February 4, 1913, 37 Stat. 657
 
 
 [12]
 Acts of March 3, 1901, 31 Stat. 1377, ch. 854 Sec. 1180; and June 30, 1902, 32 Stat. 542, ch. 1329
 
 
 [13]
 59 App.D.C. 359, 41 F.2d 982
 
 
 [14]
 60 App.D.C. 344, 54 F.2d 455
 
 
 [15]
 See Petition for Rehearing and Suggestion For Rehearing En Banc of Appellee Hartford Life Insurance Company, at 2-4 (hereafter "Hartford Petition"); Mortgage Bankers Brief, at 4ff
 
 
 [16]
 Mortgage Bankers Brief, at 5
 
 
 [17]
 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), cert. denied, 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943)
 
 
 [18]
 Von Rosen v. Dean, 59 App.D.C. 359, 41 F.2d 982 (1930)
 
 
 [19]
 Zirkle v. Daly, 60 App.D.C. 344, 54 F.2d 455 (1931)
 
 
 [20]
 Hartman v. Lubar, supra, 77 U.S.App. D.C., at 96-97, 133 F.2d, at 45-46
 
 
 [21]
 106 U.S.App.D.C. 1, 268 F.2d 577 (1959)
 
 
 [22]
 121 U.S.App.D.C. 305, 350 F.2d 435 (1965)
 
 
 [23]
 Volume Two, District of Columbia Code Annotated 1338 (1967 ed.)
 
 
 [24]
 Suggestion for Rehearing In Banc or in the Alternative for Rehearing, at 7 (hereafter "Equitable Petition")
 
 
 [25]
 The letters are incorporated into the record of the Hearings Before the District of Columbia Committee (Subcommittee No. 2) on H.R. 9441 (1 May 1962, unpublished), at 16. These Hearings were cited in our original opinion at fn. 18
 
 
 [26]
 Note 25, supra
 
 
 [27]
 Ibid, at 3
 
 
 [28]
 Ibid, at 5
 
 
 [29]
 The following, taken from the debates on the 1913 Act, is particularly instructive:
 MR. McLAUGHLIN: . . . Is there anything in the bill that would prevent anyone paying the fee and obtaining a license and then charging 2% a month upon the loan of a large sum?
 MR. KAHN: The lender could not do any business, because in good real estate security the borrower can go to a bank and get all the money he wants, within probably 60% of the value of that real estate, for 6%. (48 Cong.Rec. 726 (1912).)
 MR. KAHN: The chances are 99 in 100 where a man has real property upon which he wishes to borrow money that he will go to a bank or to some legitimate financial institution and get his loan at the prevailing rate of interest.
 MR. PAYNE: He will unless he is already mortgaged up to nearly the value of his property. Then, in a hard pinch he will mortgage his real estate a second time and pay the extra interest.
 MR. KAHN: Well, if he gets into that condition and the lender is willing to take the extraordinary risk of lending money upon property that has little or no value then he is entitled to more interest than 6%.
 MR. PAYNE: I do not see the philanthropy of that; you are giving the loan shark a chance to get his real estate. (48 Cong.Rec. 726 (1912).)
 
 
 [30]
 48 Cong.Rec. 731
 
 
 [31]
 Ibid
 
 
 [32]
 House of Representatives, Report No. 1290, 63d Cong.3d Sess. [to accompany H.R. 8768], at 2-3
 
 
 [33]
 Act of April 19, 1920; 41 Stat. 568. Neither the Senate nor House Reports nor floor debates contain any substantive comments on the amendment to the Usury Law, which was part of a large package of revisions of the District of Columbia Code. The Chairman of the House Judiciary Committee in reporting the bill explained, "[The Bill] was submitted to the judges of the [District of Columbia] Supreme Court and to a committee of the Bar Association of the District. It was very carefully considered from all angles by the judges and the Bar Association and they are very strongly in favor of this bill." 59 Cong.Rec. 4491 (1920). In the hearings preceding the bill there is no mention at all of the Loan Shark Law; the only attention paid to the usury amendment is whether the rate should be raised to 10% or 8%. Hearings Before the Committee on the Judiciary, House of Representatives, 64th Cong., 1st Sess., on H.R. 14974, Serial No. 47, 5 May 1916, at 81
 
 
 [34]
 121 U.S.App.D.C., at 311, 350 F.2d at 441
 
 
 [35]
 59 App.D.C. 359, 41 F.2d 982 (1930) (Martin, Robb, Van Orsdel)
 
 
 [36]
 The first of these four cases, Newman v. United States ex rel. Prender, 41 App. D.C. 37 (1913) (Shepard, Robb, Van Orsdel), was not cited by either of the three lenders originally. The issues are two: (1) whether the 1913 Loan Shark Act repealed the 1889 Pawnbrokers Act (it did), and (2) whether the classification of resident-nonresident was valid, thus requiring denying a license under Sec. 605 of the Act to a non-resident lender. The petitioner lived in Alexandria, Virginia, and sought a lending license, which was denied. The whole tenor of the discussion is in regard to small loans, since this was the business of the petitioner involved. There is no holding whatsoever that the Loan Shark Act is confined to small loans, as the issue did not even arise by implication
 The second case, Reagan v. District of Columbia, 41 App.D.C. 409 (1914) (Van Orsdel, Shepard, Robb), was a police court case involving loans in the principle amounts of $245 and $24.50, with interest at $5.50 and $.50. The court stated, "Aside from an attack upon the constitutionality of the Act, the sole question presented is whether or not a promissory note is a 'security' . . .." The court did say, "The Act, as above suggested, is not intended to regulate the rate of interest to be charged generally in the legitimate business of loaning money in this District, but to regulate interest rates in the loaning of small sums of money, which has heretofore been conducted in such a manner. . . ." (P. 413) And also, "In the present case, the statute not only includes in its classification every class of security, but it sharply classifies the persons who, after securing a license, may enjoy the special privileges granted by the Act." (P. 415) The special privileges granted by the Act were to charge 12% interest, a special privilege since the usury law then in force limited interest to 6% and, according to the later holdings of this court, so did Sec. 601 of the Act with the exceptions listed in Sec. 610. The court cites Sec. 605 in regard to the one per centum per month interest limit and the $200 limit on principal, which are not involved in Sec. 601. There is no holding in Reagan as to the extent of the Act's coverage.
 The third case, Chew v. District of Columbia, 42 App.D.C. 410 (1914) (Shepard, Robb, Van Orsdel), simply follows Reagan. Most of the opinion is a quotation from Reagan. The principal amounts of the loans were $100 and $50. There is no talk, much less holding, in regard to the Act applying to small loans only. The fourth, and last of these cases, Zirkle v. Daly, 60 App.D.C. 344, 54 F.2d 455 (1931) (Martin, Robb, Hitz, and Groner), is discussed at the text accompanying notes 47 and 48, infra.
 
 
 [37]
 Equitable Petition, at 2 (emphasis supplied). See also Hartford Petition, at 3; Mortgage Bankers Brief, at 6
 
 
 [38]
 Hartman v. Lubar, 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), cert. denied, 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943)
 
 
 [39]
 Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F.2d 577 (1959)
 
 
 [40]
 Indian Lake Estates v. Ten Individual Defendants, 121 U.S.App.D.C. 305, 350 F.2d 435 (1965)
 
 
 [41]
 The Hartford Petition, at 4, is in error in arguing, "However Hartford submits that the en banc decision in Von Rosen v. Dean, supra, should control until directly overruled by the full court." Von Rosen was no en banc decision, unless it be considered that the court had three members and all sat. Neither Hartman, Royall, nor Indian Lake Estates attempted to overrule Von Rosen; there was no reason to, as all four cases are correct on the facts-Von Rosen simply does not apply to the case at bar; this was presumably the reason it was not cited by either the three lenders or the trustee in their original briefs
 
 
 [42]
 59 App.D.C. 359, 41 F.2d 982
 
 
 [43]
 59 App.D.C. at 360, 41 F.2d, at 983
 
 
 [44]
 Hartford Brief, at 24; p. 11, supra
 
 
 [45]
 59 App.D.C., at 360, 41 F.2d at 983
 
 
 [46]
 Hence it could not be true that "if the debtor had prevailed, the lender would have forfeited all interest and the principal amount." The debtor never sought this under Sec. 601; he sought only a forfeiture of one-fourth of the principal under Sec. 605, which we held did not apply to loans over $200. The quoted statement epitomizes the misreading of Von Rosen on which petitioners now base their case
 
 
 [47]
 60 App.D.C. 344, 54 F.2d 455 (1931) (Martin, Robb, Hitz, and Groner)
 
 
 [48]
 77 U.S.App.D.C., at 96-97, 133 F.2d, at 45-46
 
 
 [49]
 Small Business Investment Act of 1958, Act of August 21, 1958, 72 Stat. 689, Pub.L. 85-699
 
 
 [50]
 H.R.Rep. No. 1608, 86th Cong., 2d Sess. 8 (1960)
 
 
 [51]
 See generally the original panel opinion in the case at bar, pp. 166-168, for a discussion of the 1960 and 1963 exemptions which is not repeated here
 
 
 [52]
 House of Representatives, Hearings Before the District of Columbia Committee (Subcommittee No. 2), on H.R. 9441 (1 May 1962, unpublished), at 3
 
 
 [53]
 Ibid. at 4-5
 
 
 [54]
 The full Committee on the District of Columbia filed Report No. 1895 on H.R. 9441, 87th Cong., 2d Sess. The substantive part is almost a verbatim repetition of Mr. Brady's testimony
 
 
 [55]
 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), cert. denied 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943). The Hartman panel was Chief Justice Groner (who had participated in Zirkle in 1931), Miller, and Edgerton. The panel in the succeeding case of Royall v. Yudelevit (1959) was Associate Justice Burton, of the Supreme Court, Chief Judge Prettyman, and Judge Miller. The later 1965 case of Indian Lake Estates was decided by Judges Miller, Fahy, and Danaher
 
 
 [56]
 In light of the representations made to Congress at the time the additional exemptions were granted in 1960 and 1963, and the action of Congress in adding SBIC's and the insurance companies, it is interesting to compare the position of the two petitioners and the amicus curiae now before this court. Equitable now asserts that "the conclicting opinions of this court as to the extent of the coverage of the Loan Shark Act require [] a determination of such coverage by the court sitting en banc," Equitable Suggestion, at 4 (emphasis supplied), in spite of the fact that Equitable originally never considered the five earlier opinions to be in conflict with the later, and never cited the five earlier opinions in support of its position. Hartford now asserts, "As these six cases point out, there is a complete lack of uniformity in the decisions of this court insofar as the Loan Shark Act is concerned," Hartford Petition, at 4 (emphasis supplied), although Hartford originally "relied principally" on the three later cases, cited three of the earlier cases for minor points, and originally never asserted that they conflicted in any way with the later decisions
 
 
 [57]
 Mortgage Bankers Brief, at 4-9
 
 
 [58]
 Text accompanying note 53, supra
 
 
 [59]
 It should be recalled also that Congress, in the debate on the original Loan Shark Act, rejected a proposed exemption for all real estate security transactions. See text accompanying note 31, supra. Congress wanted to allow some lending companies an exemption, but to deny it to others. Mortgage bankers were never exempt, unless they fall within "real estate brokers, as defined."
 
 
 [60]
 "Every person who sells, or offers for sale as the agent for others, real estate, wherever located, including mining and quarry property, or who makes or negotiates loans thereon, or who rents houses, buildings, stores, or real estate, or who collects rents for others, shall be regarded as a real estate broker or agent." Act of July 1st, 1902, 32 Stat. 624, Sec. 7, p 15 (emphasis supplied)
 
 
 [61]
 32 Stat. 590
 
 
 [62]
 32 Stat. 622
 
 
 [63]
 See generally Congressional Record, 57th Congress, 1st Session, pp. 4894ff, 4898ff, 4936ff, 4942ff, 4978ff, and 4987ff (1902). At the turn of the century the District was rather deeply in debt, and the fact that Congress was paying off the debts of the District with funds half of which came from the general revenues of the federal government and the other half of which came from District taxation began to cause much concern. It was generally felt in Congress that because the District lacked a tax on personal property, while all the states of the Union imposed one, rich men were flocking to the District, as a tax haven, and the District was not realizing all the tax it could, in order to assume a greater share in the financing of its own affairs. Congressional Record, supra, 4899-4900
 
 
 [64]
 The following remarks of Mr. Rucker, made in debate on H.R. 14019, and to be found at 35 Cong.Rec., supra, at 4903, are typical of those who shared this attitude:
 I am warranted in asserting that abundance of evidence could be found to establish beyond the cavil of a doubt-to an absolute demonstration-that the capitalists, real-estate agents, and speculators in this city have, in effect, entered into a conspiracy to keep at the minimum the valuation of all unoccupied property, and thus avoid the payment of reasonable and just taxes thereon. Who denies it? Who can deny it?
 
 
 [65]
 See Congressional Record, supra, note 63, at 7596, where amendment 232, which includes the Real Estate Broker provision, is inserted into the record
 
 
 [66]
 Congressional Record, supra, note 63, at 4897
 
 
 [67]
 See generally Congressional Record, supra, note 63, at 7596ff, especially the remarks of Mr. Cannon
 
 
 [68]
 "An Act to amend section 7 of an Act entitled 'An Act making appropriations to provide for the government of the District of Columbia for the fiscal year ending June 30, 1903, and for other purposes,' approved July 1, 1902, and for other purposes." Act of July 1, 1932, 47 Stat. 550
 
 
 [69]
 Paragraph 7 of this 1932 Licensing Act contains a proviso, "Provided, That nothing in this section shall be interpreted as repealing any specific Act of Congress or any of the police or building regulations of the District of Columbia regarding the establishment or conduct of the businesses, trades, professions, or callings herein named, and not inconsistent with the provisions of this section." 47 Stat. 551
 It may be possible to argue that the 1932 Act, even absent any intent of Congress, repealed by implication the definition of "real estate broker," and that from 1932 on until a new definition was enacted there was no definition of "real estate broker" at all. Or, it might be argued that since the repealing on nonrepealing provision refers to those businesses "herein named" that real estate brokers either are or are not affected in any way by the Act. We need resolve neither of these speculations here.
 
 
 [70]
 50 Stat. 787
 
 
 [71]
 See H.R.Rept. 878, and S.Rep. 1173, 75th Cong., 1st Sess
 
 
 [72]
 50 Stat. 798
 
 
 [73]
 This error began in the 1951 D.C. Code edition, and has been promulgated thereafter
 
 
 [74]
 The Manufacturers Life Insurance Company Brief (filed 1 October 1970) referred to this relationship in footnote 3, page 15: "The activities of H. G. Smithy Company were those of a Real Estate Broker, D.C. Code Sec. 45-1402 and could not have violated the Loan Shark Law, D.C. Code Sec. 26-610, nor cast any pall of invalidity on the loan, in any event."
 
 
 [75]
 These conclusions of law relating to Equitable are Paragraphs 63, 64, and 65 (Appendix pp. 26-28); to Manufacturers, Paragraphs 63, 64, and 65 (Appendix, pp. 35-36); and to Hartford, Paragraphs 70, 71, and 72 (Appendix, pp. 46-47)
 
 
 [76]
 See previous 158, at 171-173, 176
 
 
 [77]
 In its original brief Hartford devoted slightly over two full pages to the applicable law argument (pp. 25-27). Equitable devoted one page to an extra-territorial effect argument, and on rehearing neither the Hartford nor the Equitable petition even mentions this applicable law point. However, the two amicus curiae briefs-those of the Mortgage Bankers Association and Attorney Hershel Shanks-do present the question
 
 
 [78]
 With regard to which section of the Restatement of Conflict of Laws properly applies here, the court considered Sec. 188 instead of Sec. 203, because we are not dealing with the usury law situation. There is a significant difference. Indian Lake Estates, supra, note 34. These contracts are not invalid under the District of Columbia usury law, which permits 8% interest. They are invalid under a regulatory and licensing statute, hence Sec. 188 of the Restatement is the proper section, which, when applied to both Manufacturers and Hartford, in our judgment produces differing results
 
 
 [79]
 The relevant findings of fact on the Hartford claim were:
 
 
 [1]
 This controversy involves a promissory note made by Suburban Motors Inc. (Suburban), a Maryland Corporation with its principal office and place of business in the State of Maryland, to the order of Walker & Dunlop, Inc., (Walker & Dunlop), a corporation with its principal office in the District of Columbia, dated November 28, 1960 in the principal amount of $100,000, bearing interest at 6 1/2% per annum, secured by a deed of trust on real estate located in Montgomery County, Maryland, for the purposes of this memorandum described as the Pershing Drive property
 
 
 [2]
 Suburban initiated the negotiations leading up to this loan directly with Walker & Dunlop; Walker & Dunlop, itself, advanced the money required to conclude the transaction; and the settlement of the loan took place in Montgomery County, Maryland
 
 
 [3]
 On, or about, January 1, 1961, Suburban made its first installment payment under the terms of the note
 
 
 [4]
 After Walker & Dunlop had committed itself to make the loan and Suburban had accepted the commitment, Walker & Dunlop accepted the commitment of Hartford to purchase the Suburban loan at a one percent discount and on, or about, January 19, 1961, Walker & Dunlop transferred the note to Hartford
 
 
 [6]
 At the time Walker & Dunlop made the loan to Suburban it was a licensed real estate broker in the District of Columbia, but it was not licensed to lend money under the provisions of Sec. 26-601 of the District of Columbia Code
 Appendix, pp. 41-52.
 
 
 [80]
 "The place of negotiation. The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." Comment on Subsection (2) (e), Restatement, Conflict of Laws 2d, at 580 (1971)
 
 
 [81]
 "The place of performance. The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. So the state where performance is to occur has an obvious interest in the question whether this performance would be illegal (see Sec. 202). When both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance. . . ." Ibid
 
 
 [82]
 Strictly speaking, because Parkwood (and Adams) bought each property subject to the mortgage but did not assume the related note, the note itself is not directly involved in the bankruptcy proceedings. However, it is impossible to consider the Trustee's effort to void the security without considering the entire transaction, i. e., the loan of money, the note, and security in support of the note. The Referee so treated it, as did the parties, and so do we
 
 
 [83]
 "Situs of the subject matter of the contract. When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant (see Secs. 189-193). The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as important. . . ." Comment on Subsection 2(e), Restatement, Conflict of Laws 2d, at 580-581 (1971). But cf. Comment c, Reporter's Note following Sec. 203, Restatement, Conflict of Laws 2d, at 655 (1971)
 
 
 [84]
 "Domicile, residence, nationality, place of incorporation, and place of business of the parties. These are all places of enduring relationship to the parties. Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts. . . . The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business. . . ." Comment on Subsection 2(e), Restatement, Conflict of Laws 2d, at 581 (1971)
 
 
 [85]
 The relevant findings of fact on the Equitable transaction were:
 
 
 [1]
 This controversy involves a promissory note made by Potomac Cooperators, Inc., (Potomac), a Maryland Corporation, to the order of Acacia Mutual Life Insurance Company, (Acacia), a life insurance company with its principal office in the District of Columbia, dated December 22, 1959, in the principal amount of $275,000, bearing interest at 6 1/4% per annum, secured by a deed of trust on real estate located in Prince Georges County, Maryland, for the purposes of this memorandum described as Parcel B of Beltsville Industrial Park
 
 
 [6]
 At the time Acacia made the loan to Potomac it was a licensed life insurance company in the District of Columbia, but it was not licensed to lend money under the requirements of Sec. 26-601 of the District of Columbia Code
 Appendix, pp. 1-2.
 
 
 [86]
 The relevant findings of fact on the Manufacturers transaction were:
 
 
 [1]
 This controversy involves two notes, each made by Pend-Maple, Inc., a Maryland corporation with its principal office in the State of Maryland, to the order of the Manufacturers Life Insurance Company, a Canadian corporation with its principal office in Toronto, Canada, one dated August 30, 1960 in the principal amount of $545,000 and the other dated August 30, 1960 in the principal amount of $75,000, each bearing interest at 6 1/4% per annum, secured by a deed of trust on real estate located in Montgomery County, Maryland, for the purposes of this memoradum described as the Sylvan Terrace Apartments
 
 
 [2]
 The proposal that Manufacturers make these loans to Pend-Maple, Inc., was submitted to Manufacturers by the H.G. Smithy Company, (Smithy), a mortgage loan correspondent and real estate establishment with its principal, and then only, office in the District of Columbia, but the decision to make the loan was made by Manufacturers at its home office in Toronto, Canada. Manufacturers had no agent in the District of Columbia, at that time, authorized or empowered to make such loans
 
 
 [3]
 Although Smithy participated in the preliminaries leading to the conclusion of the transaction, and although legal advice, appraisals, and perhaps other professional assistance was furnished by attorneys, appraisers and others maintaining offices in the District of Columbia, the loan was finally consummated in the State of Maryland, where the notes and deeds of trust were executed and the deed of trust recorded
 
 
 [4]
 Subsequent to the consummation of the loan agreement, the monies involved were advanced over a relatively short period of time by Manufacturers from its office in Canada to Pend-Maple, Inc., at its office in Maryland, via the office of Smithy in the District of Columbia
 
 
 [5]
 Smithy did not negotiate the loan, nor was it authorized to do so either by its mortgage loan correspondent agreement with Manufacturers dated August 18, 1960, or any other agreement or authorization, and most of its activities with respect to the loan took place in Maryland
 
 
 [7]
 The Manufacturers Life Insurance Company made no loans in the District of Columbia between January 1, 1959 and May 7, 1968 at a rate of interest in excess of 6% per annum
 
 
 [87]
 See IV.B., supra
 
 
 [88]
 There are other questions which we do not decide here, although we have been urged to do so. It has not been contended that either Walker & Dunlop or Acacia Mutual lent money to borrowers exclusively outside the District on security also located outside this jurisdiction. This is a different, and under the amendment of December 1971 to the Loan Shark Law (see V, infra), a very different case. Nor is anything herein, except where specifically so stated, written to apply to the Usury Law. As we stated in Indian Lake Estates, supra note 7, the law we have here is "a quite different problem." 121 U.S.App.D.C., at 311, 350 F.2d, at 444. See also II.B.2., supra
 
 
 [89]
 P.L. 92-200, 85 Stat. 679-680, originally S.1938
 
 
 [90]
 S.1938, 92nd Congress, 1st Sess. (Print of 19 November 1971). This was prior to the amendments made by the House, which are spelled out in H.Rep.No.92-724, 92nd Congress, 1st Session, at 1-3 (8 December 1971)
 
 
 [91]
 See note 29, supra
 
 
 [92]
 Cf. text accompanying notes 30 and 31, supra
 
 
 [93]
 Supplemental Petition, at 3
 
 
 [94]
 Mote v. Incorporated Town of Carlisle, 211 Iowa 392, 233 N.W. 695 (1930); New York & O. Land Co. v. Weidner, 169 Pa. 359, 32 A. 557 (1895); See Generally 82 C.J.S. Statutes Sec. 430 (1953)
 
 
 [95]
 Referring to the provision of S.1938 which denied its application to loans which were the subject of actions under the Loan Shark Law filed before 10 November 1971, the House Report characterizes it as "a milder but equally purposeful" provision than that used by Congress in the Portal to Portal Act of 1947 (61 Stat. 84, 29 U.S.C. 251-62), which was passed as a result of the Supreme Court's decision in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). H.Rept.No. 92-724, 92nd Congress, 1st Sess. (8 December 1971), at 9. In passing this "milder" version of the retroactive provisions of the Portal to Portal Act of 1947, Congress has presumably avoided much of the constitutional attack which beset the 1947 Act, particularly insofar as it purported to apply to pending litigation. For a closely contemporary listing of these attacks on the Portal to Portal Act of 1947, see Anno, Portal-to-Portal Act, 3 A.L.R.2d 1097 (1949). See generally 16 Am.Jur.2d Constitutional Law Sec. 236 (1964)
 
 
 [1]
 Von Rosen held in substance that the Loan Shark Act was not intended to and did not apply to a $177,500 loan secured by a first deed of trust upon real estate
 
 
 [2]
 We have no such directive here
 
 
 [1]
 D.C.Code, Sec. 26-605 provides: ". . . No such loan greater than two hundred dollars shall be made to any one person: . . ." (37 Stat. 659)
 
 
 [2]
 Cf. Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095 (1969); Justin v. Jacobs, 145 U.S.App.D.C. 355, 449 F. 2d 1017 (1971) (MacKinnon concurring)
 
 
 [3]
 Hartman v. Lumbar, 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), cert. denied, 319 U.S. 767, rehearing denied, 320 U.S. 808, 64 S.Ct. 30, 88 L.Ed. 488 (1943); Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F. 2d 577 (1959); Indian Lake Estates, Inc. v. Ten Individual Defendants, 121 U.S. App.D.C. 305, 350 F.2d 435 (1965). These loans were all made at rates of interest in excess of the 8% per annum maximum rate fixed by the usury laws
 Hartman v. Lubar: $900 loan taking $1,000 note from borrower. This was probably considered a $1,000 loan at 10% discounted, though in terms of simple interest it is slightly in excess of 11% annual rate.
 Royall v. Yudelevit: Lender paid $8,500 for a 90-day note of $10,000. This is some incredible rate-it's 15% on a discount basis, nearly 18% on its face, and between 53-54% on an annual basis.
 Indian Lake Estates v. Ten Individual Defendants: Terms not given, but suit initially under the usury statute and so it can be assumed that rate was usurious under that law.